PEARLAND INVESTMENT COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pearland Inv. Co. v. Commissioner
Docket No. 18348-89
United States Tax Court
T.C. Memo 1991-562; 1991 Tax Ct. Memo LEXIS 610; 62 T.C.M. (CCH) 1221; T.C.M. (RIA) 91562; 14 Employee Benefits Cas. (BNA) 1928; November 19, 1991, Filed *610 Decision will be entered for the respondent.
Melvin M. Engel, for the petitioner. Richard T. Cummings, for the respondent. RAUM, Judge. RAUM
MEMORANDUM OPINION The Commissioner determined deficiencies in the income tax of Pearland Investment Company (petitioner) as follows: Tax Year Ended
Initial Tax Liability
Addition to the Tax
Section 4975(a) [1]
Section 6651(a)(1)
November 30, 1982
$ 73,114.00
$ 18,279.00
November 30, 1983
$ 74,873.00
$ 18,718.00
November 30, 1984
$ 78,448.00
$ 19,612.00
November 30, 1985
$ 79,771.00
-0-
This case was submitted on a stipulation of facts and exhibits. Petitioner's principal place of business was in Texas when it filed the petition herein. The principal issues are (1) whether petitioner is liable for the excise tax imposed on prohibited transactions by section 4975(a), and (2) whether the statute *611 of limitations bars the assessment of such tax. The central character in this case is Harry E. Bradley (Bradley). At all times material he owned 80 percent of the outstanding capital stock of Houston Aviation Products of Texas, Inc. (Houston Aviation). It maintained a qualified retirement plan called the Houston Aviation Products Profit Sharing Plan (the Plan) for its employees. There were only three employee-participants in the Plan other than Bradley as of September 30, 1982, when two of those three dropped out. Bradley's interest was substantially greater than those of all three of the other employees combined, as will appear more specifically hereinafter. In May of 1981, Bradley was serving as a trustee of the Plan. The Plan was interested in purchasing land, constructing a warehouse on the land, and then leasing the land and the warehouse to an affiliate of Houston Aviation called Aero Services, Inc. (Aero). Bradley, acting on behalf of the Plan, requested Melvin M. Engel, an attorney, to give his opinion whether the Plan could engage in these transactions without violating the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, *612 88 Stat. 829. By letter to Bradley, dated May 13, 1981, Engel stated that in his opinion the "Plan may invest in real property, build a warehouse on, and lease such real property together with the warehouse, to Aero * * * as part of an overall plan to acquire 'Qualified [sic] Employer Real Property' as that term is defined in the Employee Retirement Income Security Act of 1974, as amended." On July 28, 1981, the Plan purchased from unrelated third parties five acres of land located in Pearland, Texas. In August of 1981, the Plan entered into a contract with an unrelated third party for the construction of a building on this land. The building was completed in April or May of 1982. The total cost of land and building to the Plan was $ 1,408,292. The land and building together have been referred to as the "property." The Plan paid for the property by using $ 828,292 of its own money, by borrowing $ 500,000 from the Pearland State Bank (the bank), and by using a payment of $ 80,000 made by petitioner on April 23, 1982. The parties have stipulated that "The trustees of the Plan intended to lease the property to Aero," and that "The trustees of the plan intended to acquire additional *613 real property, of such a type and in such a manner as the property would qualify as Qualifying Employer Real Property under section 407(d)(4)(A) of * * * ("ERISA")." It was apparently recognized that the single parcel of land and building alone would not so qualify. Section 407(d)(4) of ERISA defines "qualifying employer real property" to mean "parcels of employer real property -- (A) if a substantial number of the parcels are dispersed geographically." 88 Stat. 882. And it was expected or hoped that if other real property located elsewhere were purchased by the Plan, the requirement of subparagraph (A) of section 407(d)(4) of ERISA would be met. However, the plan to acquire additional real property was abandoned by the trustees when Bradley was diagnosed as having terminal cancer in 1982. As explained in a letter some four years later from Engel to the Department of Labor applying for an exemption on behalf of petitioner: Because the continued existence of the Plan depended on the existence of Harry Bradley, his real estate knowledge, credit background, and the companies he owned, the participants of the Plan agreed it would be in their best interest to make the Plan as *614 liquid as possible. The participants agreed it would be in the Plan's best interest to dispose of the current real estate investment instead of acquiring additional real estate investment property, as previously planned.
Petitioner was formed by Bradley in connection with the disposition of the property. On July 30, 1982, the Plan sold the property to petitioner for $ 1,408,292, paid as follows: Assumption of construction loan
$ 500,000
Credit previous cash advance
80,000
Note from the petitioner to the Plan
828,292
$ 1,408,292
On September 30, 1982, petitioner paid off the construction loan owed to the bank. Also, by October 1, 1982, as stipulated by the parties, petitioner had paid $ 178,292 on its note to the Plan, reducing its principal obligation thereon to $ 650,000. At the same time, the interest rate was reduced from 16 percent to the prime rate, and the term was extended indefinitely. [2] As of September 30, 1982, the Plan had four participants, whose names and account balances as of that date were as follows: Jack Blevins
$ 137,135.68
Harry E. Bradley
516,741.80
Jewell Harris
100,720.60
Helen Goss
9,336.19
$ 763.934.27
*615 After September 30, 1982, Goss and Blevins no longer participated in the Plan. The Plan was terminated on April 15, 1985, and all of its funds were distributed to Bradley and Harris. A portion of Bradley's distribution was applied to pay off the balance on petitioner's note to the Plan. The property was never leased to Aero Services, or to any other tenant. The record does not indicate that the Plan acquired any other real property. The Commissioner determined that petitioner was a "disqualified person" and that it had "entered into prohibited transactions under section 4975(c) of the Internal Revenue Code with Houston Aviation Products of Texas, Inc. Profit Sharing Trust." Accordingly, the Commissioner determined that petitioner was liable for the section 4975(a) initial excise tax of 5 percent of the amount involved in the transactions for each of its taxable years ending on November 30 in 1982, 1983, 1984, and 1985. 1. Section 4975. Section 4975 entered the Code through section 2003 of ERISA, Pub. L. 93-406, 88 Stat. 829, 971. Section 4975(a) imposes an "initial" or first tier tax on each "prohibited transaction" equal to 5 percent of the amount involved in that transaction *616 for each year or part of a year in the taxable period. [3] All of the disqualified persons who participate in a prohibited transaction are jointly and severally liable for the tax. Secs. 4975(a) and 4975(f)(1). Relevant statutory provisions are set forth in the margin. [4]
*617 Petitioner is a disqualified person under section 4975(e)(2)(G)(i) because 100 percent of its stock was owned by Bradley, who was a disqualified person under section 4975(e)(2)(E)(i) since he owned 80 percent of the stock of Houston Aviation, an employer under section 4975(e)(2)(C) whose employees were covered by the Plan. A reading of the statutory provisions leaves no room for doubt that they cover the present situation. Section 4975(e)(2)(G) includes a corporation in the definition of the term "disqualified person" if 50 percent or more of the voting power or 50 percent or more of the value of the corporation's stock is owned by a person described in section 4975(e)(2)(E). A person is described in section 4975(e)(2)(E) if, inter alia, he owns 50 percent or more of the voting power or 50 percent or more of the total value of the shares of an employer described in section 4975(e)(2)(C). An employer is described in section 4975(e)(2)(C) if any of its employees are covered by the retirement plan in question. In this case, since Houston Aviation's employees are covered by the Plan, it is an employer described in section 4975(e)(2)(C). Because Bradley owned more than the requisite *618 percentage of Houston Aviation's stock, he was a person described in section 4975(e)(2)(E). Finally, because Bradley was described in section 4975(e)(2)(E), and because he owned more than the requisite percentage of stock in petitioner, petitioner is also a disqualified person pursuant to section 4975(e)(2)(G). Moreover, petitioner, a disqualified person, participated in a "prohibited transaction." The term "prohibited transaction" includes the sale or exchange of any property between a plan and a disqualified person. Section 4975(c)(1)(A). A "prohibited transaction" also includes "the lending of money or other extension of credit between a plan and a disqualified person." Section 4975(c)(1)(B). Thus, petitioner's advance of money to the Plan, purchase of the property, assumption of the construction indebtedness, and the issuance of the promissory note each constituted a separate "prohibited transaction." Petitioner does not challenge any of the foregoing analysis, which leads to its being subject to the initial 5 percent tax of the amount involved in each prohibited transaction for every year or part of a year in the taxable period. And it has stipulated that the Commissioner *619 has correctly calculated the amount of the taxes. However, it seeks to avoid liability by relying on section 4975(d)(13), which provides that the prohibitions in section 4975(c) shall not apply "to any transaction which is exempt from section 406" of ERISA (29 U.S.C. sec. 1106 (1988)) [5] by reason of section 408(e) of that Act (29 U.S.C. sec. 1108(e)(1988)). Pertinent portions of ERISA as amended are set forth in the margin. [6] Section 406 of ERISA prohibits fiduciaries from causing plans to enter into "prohibited transactions." [7] However, section 408(e) of ERISA (29 U.S.C. sec. 1108(e)) provides that if certain requirements are met, the prohibitions of section 406 of ERISA will not apply to the sale of "qualifying employer real property" as defined by section 407(d)(4) of ERISA. We hold that the section 4975(d)(13) exemption is inapplicable here. *620 The property at issue here is not "qualifying employer real property," and therefore does not qualify for the exemption provided in section 408(e) of ERISA. Consequently, section 4975(d)(13) does not exempt petitioner from the tax imposed by section 4975(a). In order to be "qualifying employer real property," real estate must first be "employer real property." Sec. 407(d)(4) of ERISA. And, according to section 407(d)(2) of ERISA, "employer real property" means real property "which is leased to an employer of employees covered by the plan, or to an affiliate of such employer." However, the property in this case was never leased to Houston Aviation or to any affiliate of an employer of employees covered by the Plan. The property therefore cannot be considered "employer real property." Second, assuming arguendo that the property were employer real property, it would still fail to be "qualifying employer real property." The term "qualifying employer real property" is defined in section 407(d)(4) of ERISA to mean "parcels of employer real property," which are subject to certain requirements one of which, in section 407(d)(4)(A), is that a "substantial number of the parcels are dispersed *621 geographically." What we have here, however, is a single piece of real property, and a single piece of real property obviously cannot be geographically dispersed. Lambos v. Commissioner, 88 T.C. 1440, 1451 (1987). For this reason as well, section 408(e) of ERISA is inapplicable on its face. [8]
Petitioner apparently does not contend that the express language of section 408(e) of ERISA applies to exempt it from the prohibitions of section 406 of ERISA. But it does contend that the good faith of the parties to the transactions at issue and the lack of harm suffered by the plan participants should cause section 408(e) to apply. We reject this contention. Section 406 has been held to have created a per se prohibition of the transactions *622 described therein. Donovan v. Cunningham, 716 F.2d 1455, 1464-1465 (5th Cir. 1983), cert. denied 467 U.S. 1251, 82 L. Ed. 2d 839, 104 S. Ct. 3533 (1984); Rutland v. Commissioner, 89 T.C. 1137, 1146 (1987); Leib v. Commissioner, 88 T.C. 1474, 1480 (1987). We held in Leib that "Good intentions and a pure heart are no defense" to a violation of section 4975(c)(1).[9]Leib v. Commissioner, supra at 1481; O'Malley v. Commissioner, 96 T.C. 644, 651 (1991). And other courts have held that the lack of any harm to the plan does not excuse a violation of the prohibited transaction rules of section 406. E.g., McDougall v. Donovan, 552 F. Supp. 1206, 1215 (N.D. Ill. 1982); Marshall v. Kelly, 465 F. Supp. 341, 354 (W.D. Okla. 1978). *623 Petitioner also contends that it qualifies for the exemption provided under section 4975(c)(2) of the Internal Revenue Code. That section, quoted supra note 4, directs the Secretary of the Treasury to establish a procedure for granting exemptions from the definition of "prohibited transaction." The Secretary of the Treasury transferred his power under this section to the Secretary of Labor, who exercises a similar power to grant exemption under section 408(a) of ERISA. [10] Reorganization Plan No. 4 of 1978, 43 Fed. Reg. 47713 (Oct. 17, 1978). As indicated earlier herein, petitioner, through its attorney Engel, did apply by letter to the Department of Labor for such relief. That letter, dated July 17, 1986, sought exemption under section 408(a) of ERISA and section 4975(c)(2). The Department of Labor treated petitioner's application under these two provisions as a single application. Because section 408(a) of ERISA and section 4975(c)(2) contain substantially identical language to the extent relevant here, and because the Secretary of the Treasury transferred his power under section 4975(c)(2) to the Secretary of Labor, we accept the consolidation of petitioner's *624 request for exemption. The Department of Labor denied petitioner's requests in a letter dated May 4, 1987. Under section 408(a) of ERISA and section 4975(c)(2) of the Code, the Secretary of Labor may not grant exemptions unless they are (1) administratively feasible, (2) in the interests of the plan and of its participants and beneficiaries, and (3) protective of the rights of participants and beneficiaries of the plan. Petitioner argues that it has "met the three criteria of allowing an exemption under Internal Revenue Code section 4975(c)(2), and the exemption should have been granted." We hold otherwise, and agree with the Department of Labor that petitioner was not entitled to the exemptions provided by section 408(a) of ERISA and section 4975(c)(2) of the Internal Revenue Code. In support of its decision to deny the exemptions requested by petitioner, the Department of Labor cited four factors. First, a conflict of interest existed that created the potential for abuse. Second, *625 petitioner had not adequately demonstrated that the transactions were in the best interest of the Plan. Third, there were no adequate safeguards for the protection of the Plan. Fourth, a high percentage of Plan assets was involved in the transactions. We will examine these conclusions in the light of the evidence of record. The Department of Labor found that Bradley acted both as a fiduciary of the Plan and as the owner of petitioner. Thus, he controlled the sale price, the terms of the note, and the action to be taken in the event of petitioner's default. Furthermore, we note that Bradley owned all of petitioner's stock but was not the only participant in the Plan. Thus, he may conceivably have had a motive to structure the sale and financing of the property to the detriment of the Plan and the benefit of his wholly-owned corporation. The Department of Labor observed that the potential for harm would have been reduced if an independent fiduciary had represented the interests of the Plan in negotiating the terms of the transaction, but this did not occur. The Department of Labor also found little evidence to suggest that the terms of the transaction were fair to the Plan. *626 At a conference held with employees of the Department, petitioner's attorney claimed that the sale price of the property exceeded the price the Plan could have obtained on the open market, but no independent appraiser verified this. Nor did any independent party verify that the interest rates on the promissory notes were fair market value rates, and there was no explanation for the decrease in the interest rate from 16 percent to the prime rate, which then appeared to be 11 percent. The Department of Labor noted that the transaction was inconsistent with general fiduciary responsibility standards (set forth in sections 403 and 404 of ERISA) because the Plan's assets were not properly diversified. Almost all of the Plan's assets were used to purchase the property and construct the building. Furthermore, the promissory note constituted almost all of the Plan's assets at the time of the transaction, and the note as modified then constituted approximately 85 percent of the Plan's assets. We observe that the Plan held the note for approximately 2 and 1/2 years after modification, and was thus inadequately diversified for this substantial period. In light of the foregoing factors, *627 we uphold the decision of the Department of Labor to deny petitioner's request for exemption under section 408(a) of ERISA and section 4975. We so hold upon our own review of the evidence of record, without even considering whether the decision of the Secretary of Labor should be accepted in the absence of a showing of clear error, or that it was arbitrary or capricious, or represented an abuse of discretion on his part. 2. Statute of Limitations
Petitioner raises the statute of limitations as an affirmative defense. We reject this claim as it pertains to all of the taxable years before us, although on different grounds as to different years. Generally, tax must be assessed within three years of the date the return was filed, and may be assessed at any time if no return was filed. Sec. 6501(a) and (c)(3). [11] Furthermore, the period of limitations is extended to six years if the return understates the amount of excise tax required to be paid by 25 percent or more of the amount due, provided that in computing the amount of tax understated there shall not be taken into account the amount of tax attributable to a transaction disclosed in the return or in an attached statement *628 adequate to disclose the existence and nature of the item. Sec. 6501(e)(3). Thus, petitioner's statute of limitations defense depends in part upon whether petitioner filed or is deemed to have filed returns for the years at issue, and, if so, whether such returns understated the amount of tax by 25 percent or more computed in accordance with section 6501(e)(3). *629 The subject of the returns is potentially confusing as will appear shortly because two different types of returns are involved. The first is the return required to be filed by the disqualified person on Form 5330, as set forth in section 54.6011-1(b), Excise Tax Regs.: (b) Tax on prohibited transactions. Every disqualified person (as defined in section 4975(e)(2)) liable for the tax imposed under section 4975(a) with respect to a prohibited transaction shall file an annual return on Form 5330 and shall include therein the information required by such form and the instructions issued with respect thereto. The annual return on Form 5330 shall be filed with respect to each prohibited transaction and for each taxable year (or part thereof) of the disqualified person in the taxable period (as defined in section 4975(f)(2)) [12] beginning on the date on which such prohibited transaction occurs.
No such returns were filed here. The parties have stipulated *630 that "The petitioner did not file Form 5330, return of Initial Excise Taxes Related to Pension and Profit-Sharing Plans, for any taxable period." The second type of return is on Form 5500-C, the one filed by the Plan. Here the Plan filed its Forms 5500-C for its fiscal years ending September 30, 1982 and 1983, on April 30, 1983, and April 30, 1984, respectively. [13] The record does not show that it filed any Forms 5500-C, or any similar forms, for the Plan's fiscal years 1984 and 1985. The significance of the Plan's returns in respect of the section 6501 statute of limitations as it relates to petitioner rests on section 6501(l)(1), which provides in pertinent part: [14]
For purposes of any tax imposed by * * * section 4975, the return referred to in this section shall be the return filed by the * * * plan * * * for the year in which the act (or failure to act) giving rise to liability for such tax occurred. * * *
*631 Thus, the period of limitations for petitioner's 1982 and 1983 taxable years started to run on April 30, 1983, and April 30, 1984, [15] respectively. And in view of the absence of any showing in the record that any returns were filed for 1984 and 1985, the period of limitations for petitioner's 1984 and 1985 taxable years has not started to run at all. See sec. 6501(c)(3) and secs. 301.6501(e)-1(c)(4) and 301.6501(n)-1, Proced. & Admin. Regs. Moreover, petitioner consented to the extension of time for the assessment of tax with respect to its taxable periods ending in 1982 and 1984 [16] by executing copies of Form 872-A with respect to those years. Petitioner has not filed Forms 872-T revoking such consents, and the record does not otherwise indicate that the consents have been terminated or are in any way invalid. Accordingly, the period of limitations with respect to petitioner's 1982 taxable year has not expired. Section 6501(c)(4). *632 We hold that the 6-year statute of limitations applies to petitioner's 1983 taxable year, and that the deficiency notice, dated April 21, 1989, was issued well within the 6-year period beginning April 30, 1984, when the return was filed. As noted previously, section 6501(e)(3) provides that a 6-year period of limitations applies if the return (here, the Form 5500-C filed by the Plan) understates the amount of tax required to be paid by 25 percent or more of the amount due. In this case, the understatement is in effect 100 percent of the amount due, because petitioner was liable for the tax and the Form 5500-C filed by the Plan does not disclose any tax liability at all. See sec. 301.6501(e)-1(c)(4), Proced. & Admin. Regs. Petitioner relies on the second sentence in section 6501(e)(3), which provides that the 6-year period of limitations shall not apply if the transaction creating the liability is disclosed on the return or on a separate statement attached to the return. The disclosure must be made in such manner as to "apprise the Secretary of the existence and nature of the transaction." Sec. 6501(e)(3). Petitioner argues that the Form 5500-C filed by the Plan satisfied this *633 condition. We hold otherwise. While the Form 5500-C may have been sufficient to inform the Commissioner that some real estate was sold, as contended by petitioner, it did not disclose that the buyer was a disqualified person. Yet the relationship between petitioner and the Plan is critical to the existence of petitioner's excise tax liability. Without any knowledge or even suggestion that a disqualified person had purchased the property from the Plan, the Commissioner could not have known that a prohibited transaction had occurred. We reached the same result on similar facts in Thoburn v. Commissioner, 95 T.C. 132, 147-150 (1990). Petitioner also argues that its request for exemption filed with the Department of Labor provided the Commissioner with "actual knowledge of the alleged prohibited transactions before the original three-year statute of limitations had run" and that the three year statute of limitations should therefore apply. No authority has been called to our attention in support of the novel proposition that a transaction will be deemed to have been disclosed in the return merely because the Commissioner receives notice of the transaction at *634 any time before the expiration of the 3-year period of limitations. In any event, petitioner has not shown that the IRS had any such notice prior to April 30, 1987, when the 3-year period of limitations for 1983 would have expired. Bearing in mind that petitioner's statute of limitations argument is an affirmative defense on which it bears the burden of proof, the state of the record is hardly such that it has carried that burden. We reject petitioner's contention without further discussion, calling attention, however, to the established rule of statutory interpretation that a statute of limitations seeking to bar rights of the Government must receive a strict construction in favor of the Government. Badaracco v. Commissioner, 464 U.S. 386, 391-392, 78 L. Ed. 2d 549, 104 S. Ct. 756 (1984); Thoburn v. Commissioner, supra at 146-147. The Plan filed Form 5500-C for its 1983 fiscal year April 30, 1984. And as noted supra p.23, the Commissioner issued the statutory notice of deficiency for that year on April 21, 1989, which was within six years after April 30, 1984, the date on which the Form 5500-C for fiscal 1983 was filed. We therefore hold that the assessment of *635 tax with respect to petitioner's 1983 taxable year is not barred by the statute of limitations. 3. Additions to Tax. Section 6651(a)(1). Lastly, we turn to the additions to tax under section 6651(a)(1) for failure to file a return. Petitioner has not presented any evidence or argument on brief regarding this point. There is no basis for disturbing the Commissioner's determination in this respect. Decision will be entered for the respondent. Footnotes
1. Except as otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the taxable years at issue.↩
2. It is not clear on the record whether the note continued in existence incorporating the changes or whether a new replacement note was executed reflecting the changes. In the circumstances, we will refer to the continuing obligation simply as "the note."↩
3. Sec. 4975(b) imposes an additional or second tier tax equal to 100 percent of the amount involved if the 5 percent initial tax is imposed by sec. 4975(a)↩ and the transaction is not corrected within the taxable period. The Commissioner did not determine that petitioner owed the 100 percent second tier tax, and it is not in controversy here. 4. SEC. 4975. TAX ON PROHIBITED TRANSACTIONS. (a) Initial Taxes on Disqualified Person. -- There is hereby imposed a tax on each prohibited transaction. The rate of tax shall be equal to 5 percent of the amount involved with respect to the prohibited transaction for each year (or part thereof) in the taxable period. The tax imposed by this subsection shall be paid by any disqualified person who participates in the prohibited transaction (other than a fiduciary acting only as such). * * * (c) Prohibited Transaction. -- (1) General rule. -- For purposes of this section, the term "prohibited transaction" means any direct or indirect -- (A) sale or exchange, or leasing, of any property between a plan and a disqualified person; (B) lending of money or other extension of credit between a plan and a disqualified person;
* * * (2) Special exemption. -- The Secretary shall establish an exemption procedure for purposes of this subsection. Pursuant to such procedure, he may grant a conditional or unconditional exemption of any disqualified person or transaction, orders of disqualified persons or transactions, from all or part of the restrictions imposed by paragraph (1) of this subsection. Action under this subparagraph may be taken only after consultation and coordination with the Secretary of Labor. The Secretary may not grant an exemption under this paragraph unless he finds that such exemption is -- (A) administratively feasible, (B) in the interests of the plan and of its participants and beneficiaries, and (C) protective of the rights of participants and beneficiaries of the plan.
* * * (d) Exemptions. -- The prohibits provided in subsection (c) shall not apply to -- * * * (13) any transaction which is exempt from section 406 of * * * [the Employee Retirement Income Security] Act [of 1974] by reason of section 408(e) of such Act (or which would be so exempt if such section 406 applied to such transaction);
* * * (e) Definitions. -- (1) Plan. -- For purposes of this section, the term "plan" means a trust described in section 401(a) which forms a part of a plan, or a plan described in section 403(a) or 405(a), which trust or plan is exempt from tax under section 501(a) * * *. (2) Disqualified person. -- For purposes of this section, the term "disqualified person" means a person who is -- (A) a fiduciary; (B) a person providing services to the plan; (C) an employer any of whose employees are covered by the plan; (D) an employee organization any of whose members are covered by the plan; (E) an owner, direct or indirect, of 50 percent or more of -- (i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation, (ii) the capital interest or the profits interest of a partnership, or (iii) the beneficial interest of a trust or unincorporated enterprise, which is an employer or an employee organization described in subparagraph (C) or (D); * * * (G) a corporation, partnership, or trust or estate of which (or in which) 50 percent or more of -- (i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of such corporation, (ii) the capital interest or profits interest of such partnership, or (iii) the beneficial interest of such trust or estate, is owned directly or indirectly, or held by persons described in subparagraph (A), (B), (C), (D), or (E); (H) an officer, director (or an individual having powers or responsibilities similar to those of officers or directors), a 10 percent or more shareholder, or a highly compensated employee (earning 10 percent or more of the yearly wages of an employer) of a person described in subparagraph (C), (D), (E), or (G); * * *
* * * (f) Other Definitions and Special Rules. -- For purposes of this section -- (1) Joint and several liability. -- If more than one person is liable under subsection (a) or (b) with respect to any one prohibited transaction, all such persons shall be jointly and severally liable under such subsection with respect to such transaction. (2) Taxable period. -- The term "taxable period" means, with respect to any prohibited transaction, the period beginning with the date on which the prohibited transaction occurs and ending on the earliest of -- (A) the date of mailing a notice of deficiency with respect to the tax imposed by subsection (a) under section 6212, (B) the date on which the tax imposed by subsection (a) is assessed, or (C) the date on which correction of the prohibited transaction is completed.
* * * (4) Amount involved. -- The term "amount involved" means, with respect to a prohibited transaction, the greater of the amount of money and the fair market value of the other property given or the amount of money and the fair market value of the other property received; except that, in the case of services described in paragraphs (2) and (10) of subsection (d) the amount involved shall be only the excess compensation. For purposes of the preceding sentence, the fair market value -- (A) in the case of the tax imposed by subsection (a), shall be determined as of the date on which the prohibited transaction occurs; * * *↩
5. Secs. 404, 406, 407, and 408 of ERISA are incorporated in 29 U.S.C. secs. 1104, 1106, 1107, and 1108 (1988)↩, respectively. 6. PROHIBITED TRANSACTIONS SEC. 406. (a) Except as provided in section 408: (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect- (A) sale or exchange, or leasing, of any property between the plan and a party in interest; (B) lending of money or other extension of credit between the plan and a party in interest;
* * * (2) No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 407(a).
SEC. 407. (d) For purposes of this section -- * * * (2) The term "employer real property" means real property (and related personal property) which is leased to an employer of employees covered by the plan, or to an affiliate of such employer. * * * (4) The term "qualifying employer real property" means parcels of employer real property -- (A) if a substantial number of the parcels are dispersed geographically; (B) if each parcel of real property and the improvements thereon are suitable (or adaptable without excessive cost) for more than one use; (C) even if all of such real property is leased to one lessee (which may be an employer, or an affiliate of an employer); and (D) if the acquisition and retention of such property comply with the provisions of this part (other than section 404(a)(1)(B) to the extent it requires diversification, and sections 404(a)(1)(C), 406 and subsection (a) of this section).
EXEMPTIONS FROM PROHIBITED TRANSACTIONS SEC. 408. (a) The Secretary shall establish an exemption procedure for purposes of this subsection. Pursuant to such procedure, he may grant a conditional or unconditional exemption of any fiduciary or transaction, or class of fiduciaries or transactions, from all or part of the restrictions imposed by sections 406 and 407(a). Action under this subsection may be taken only after consultation and coordination with the Secretary of the Treasury. An exemption granted under this section shall not relieve a fiduciary from any other applicable provision of this Act. The Secretary may not grant an exemption under this subsection unless he finds that such exemption is -- (1) administratively feasible, (2) in the interests of the plan and of its participants and beneficiaries, and (3) protective of the rights of participants and beneficiaries of such plan.
* * * (e) Sections 406 and 407 shall not apply to the acquisition or sale by a plan of qualifying employer securities (as defined in section 407(d)(5)) or acquisition, sale or lease by a plan of qualifying employer real property (as defined in section 407(d)(4)) -- (1) if such acquisition, sale, or lease is for adequate consideration (or in the case of a marketable obligation, at a price not less favorable to the plan than the price determined under Section 407(e)(1)), (2) if no commission is charged with respect thereto, and (3) if -- (A) the plan is an eligible individual account plan (as defined in section 407(d)(3)), or (B) in the case of an acquisition or lease of qualifying employer real property by a plan which is not an eligible individual account plan, or of an acquisition of qualifying employer securities by such a plan, the lease or acquisition is not prohibited by section 407(a).↩
7. The list of prohibited transactions in section 406 of ERISA is similar to the "prohibited transactions" set forth in section 4975(c)(1) of the Internal Revenue Code↩.
8. Because we decide that sec. 407(d)(2) and (4) of ERISA preclude the property purchased by petitioner from being "qualifying employer real property," we need not reach the issue of whether petitioner satisfied other requirements contained in section 408(e) of ERISA.↩
9. As noted previously, the transactions prohibited by sec. 406 of ERISA are similar to those taxed by sec. 4975(a). These provisions were intended to apply in the same manner to the same transaction to the maximum extent possible. H. Rept. 93-1280 (Conf.) (1974), 1974-3 C.B. 415, 456-457. Thus, cases decided under one set of provisions are relevant in interpreting the other. Leib v. Commissioner, 88 T.C. 1474, 1480↩ (1987).
10. See supra↩ note 6.
11. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General rule. -- Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. * * * (c) Exceptions. -- * * * (3) No return. -- In the case of failure to file a return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time. (4) Extension by agreement. -- Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title, * * * both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.
* * * (e) Substantial Omission of Items. -- Except as otherwise provided in subsection (c) -- * * * (3) Excise taxes. -- In the case of a return of a tax imposed under a provision of subtitle D, if the return omits an amount of such tax properly includible thereon which exceeds 25 percent of the amount of such tax reported thereon, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return is filed. In determining the amount of tax omitted on a return, there shall not be taken into account any amount of tax imposed by chapter 41, 42, 43, or 44 which is omitted from the return if the transaction giving rise to such tax is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the existence and nature of such item.
* * * (n) Special Rule for Chapter 42 and Similar Taxes. -- (1) In general. -- For purposes of any tax imposed by chapter 42 (other than section 4940) or by section 4975↩, the return referred to in this section shall be the return filed by the private foundation, plan, or trust (as the case may be) for the year in which the act (or failure to act) giving rise to liability for such tax occurred. * * *
12. Sec. 4975(f)(2) is set forth supra↩ note 4.
13. The stipulation of the parties does not give the filing dates, but the Government has requested us to find as a fact that the returns were filed on these dates and petitioner has not objected. ↩
14. These provisions previously appeared in the Code as sec. 6501(n)(1), which was redesignated sec. 6501(l)(1) by sec. 163(b)(1) of Pub. L. 98-369, 98 Stat. 698.↩
15. However, to the extent that a prohibited transaction occurred in 1982 after September 30, 1982, it would fall within fiscal 1983 and the period of limitations in respect of the tax on that prohibited transaction would begin to run from the date that the Plan's return for fiscal 1983 was filed. And similarly, to the extent that a prohibited transaction occurred in 1983 after↩ September 30, 1983, it would fall within the Plan's 1984 fiscal year, and the period of limitations in respect of the tax thereon would begin to run from the date that the Plan's return for fiscal 1984 was filed. 16. The extension with respect to 1984 is puzzling in view of the absence of evidence in the record that any return had been filed for that year.↩