**Daniel SCHULIST, et al.,
Plaintiffs-Appellants,**

v.

**BLUE CROSS OF IOWA and Blue Shield
of Iowa, Iowa Corporations,
Defendants-Appellees.**

No. 83–1082.

United States Court of Appeals,
Seventh Circuit.

Argued May 23, 1983.
Decided Sept. 14, 1983.

---

N. Morrison Torrey, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for plaintiffs-appellants.

G. Christian Kronberg, Kirkland & Ellis, Chicago, Ill., for defendants-appellees.

Before CUDAHY, POSNER and COFFEY, Circuit Judges.

CUDAHY, Circuit Judge.

The plaintiffs, trustees of the Pattern Makers' Health and Welfare Trust ("Trustees," "Trust"), sued Blue Cross of Iowa and Blue Shield of Iowa ("BC" and "BS") alleging breach of contract, breach of fiduciary duty under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, and fraud. The district

court, 553 F.Supp. 248, granted defendants' motions for summary judgment as to the contract and ERISA claims and remanded the pendent state law fraud claim to Iowa state court following dismissal of the federal claims. The Trust has appealed the summary judgment as to the contract and ERISA claims. We affirm.

## I

The Trust is a joint labor-management trust established under collective bargaining agreements between the Pattern Makers' League of North America and the Midwest Pattern Manufacturers' Association for the purpose of providing employee health and welfare benefits. The defendants, BC and BS, are providers of health benefit plans to individual and group subscribers. On September 15, 1977, the Trustees appointed Dan Cusack ("Cusack") as their broker and instructed him to obtain bid proposals from companies qualified to underwrite the medical and life, accidental death and dismemberment, and disability and dental benefits for the Trust's Health and Welfare Plan (the "Plan"). Exhibit B to the Complaint. The Trust stated in its letter confirming Cusack's appointment as broker that his compensation would be paid by the insurance company ultimately selected by the Trustees; and on December 31, 1977, BC and BS, after their selection, entered into an Agency Agreement with Cusack under which BC and BS paid him 1% of the monthly group income received by BC and BS (hereinafter referred to collectively as "BC/BS") from the Plan.

In response to a solicitation of bids, BC/BS submitted the successful bid and became the Plan's medical carrier. A letter dated December 6, 1977, from Blue Cross District Sales Director Mike Stoll to Cusack describes in general terms the benefits which Blue Cross promised to provide for Trust members during the year 1978 at a monthly premium of $86.15 per Trust beneficiary. Exhibit C to the Complaint. In a letter to BC/BS dated December 6, 1977, the Trustees confirmed that BC/BS was being chosen as the medical carrier for the

Plan, according to the terms described in the proposal received by Cusack; the Trustees' letter reiterated that "the cost [would] be a composite rate of $86.15 monthly for each member ... and that such rate shall hold true during the 1978 year regardless of changes in population groups." Exhibit D to the Complaint. Thereafter, a Group Hospital and Medical-Surgical Service Agreement ("Service Agreement") describing the health benefits provided to Trust beneficiaries by BC/BS was prepared and executed by the parties in November 1978. Exhibit E to the Complaint. The parties agree that these three documents constitute the written contract (the "Contract") at issue here, although they disagree as to whether all the terms of that Contract are set forth in these three documents.

During 1978, BC/BS provided the agreed benefits in return for the monthly premium of $86.15 per Trust beneficiary. By the end of the initial year, BC/BS had accumulated a premium surplus of approximately $317,000. This surplus was the amount received by BC/BS in premiums minus the sum of the amounts paid out to cover claims and the following items: claims administration and general office expense, contingency reserves, group conversion charge, control plan expense, and "risk charge." Appellants' Brief at 11. Since "risk charge" represents a target profit figure, the Trustees argue that any amount retained over and above that risk charge constitutes an excessive profit to BC/BS.

In late 1978, the Trust elected to renew the agreement with BC/BS through 1979, but the monthly premium per member was reduced from $86.15 to $75.51 and some benefits were added to the coverage. At the end of 1979, a further premium surplus of $32,000 resulted, despite the premium reduction. An entirely new agreement was then drawn up between the Trust and BC/BS for 1980, under which any future premium surplus would be returned to the Trust. The parties expressly agreed that the 1980 Agreement would not prejudice either party's rights with respect to the previous two years. In fact, no further

surplus accumulated, and BC/BS was terminated as carrier for the Trust in 1980.

As the medical carrier for the Plan, BC/BS administered the claims procedure under the Plan and determined the claims to be honored and the benefits to be paid. BC/BS also provided a Claims Review and Appeal Procedure, making the final decisions as to who received benefits under the Plan. In addition, as an organization providing benefits under a Plan governed by ERISA, BC/BS was required to provide certain information to the Trust for inclusion in the annual report which such a trust must under ERISA submit to the Secretary of Labor. *See* 29 U.S.C. § 1023(a)(2). Although BC/BS did provide such information to the Trust in 1978 and 1979, the Trustees allege that the required information was incompletely or inaccurately provided in various ways. The reports submitted on "Schedule A" forms were not certified, as required by the statute. Some reports failed to indicate that commissions were paid to Cusack and their amounts. On other forms, information about the premium surplus amounts was either omitted or provided inconsistently on differing sections of the forms. Many of the forms submitted also provided the required financial information on the section of the form labeled "experience-rated." This term refers to a retrospective type of rate-setting which requires the readjustment of rates for the previous year in the event either of a premium surplus or of a deficit.[1]

Insisting that the 1978 and 1979 contracts with BC/BS were retrospectively rated, the Trust requested that BC/BS return the approximately $349,000 of premium surplus to the Plan. When BC/BS refused to do so, the Trustees filed a complaint on December 10, 1980, alleging, *inter alia,* that BC/BS had failed to discharge its fiduciary duties under ERISA and had also breached its obligations under the Contract. The district court granted the defendants' motion for summary judgment as to both claims. The court held that, although it had failed to comply strictly with the reporting requirements, BC/BS had not breached any fiduciary duty under ERISA and that the Contract between the parties unambiguously indicated that it had not agreed that the premium surplus was to be refunded. In their appeal here, the Trustees assert that the district court misinterpreted the fiduciary standards of ERISA in various ways, and in particular their application to an organization like BC/BS. The Trustees further argue that the district court erred in holding that the Contract between the parties was not ambiguous and in failing to consider extrinsic evidence of the parties' intent.

## II

The Trustees raise two claims under ERISA, one based on the allegedly unreasonable compensation retained by BC/BS and one based upon violations of the ERISA reporting requirements. We shall deal with these two claims in order. First, it is charged that BC/BS breached its fiduciary obligation under ERISA by retaining what is alleged to be excessive compensation— the premium surplus described above. The Trustees reach this conclusion by reading together ERISA Section 406, 29 U.S.C. § 1106, which prohibits various types of

---

1. More specifically, the Trustees' complaints are the following: In May of 1979 BC/BS submitted a set of Schedule A forms for calendar year 1978 on which the financial information was listed under the experience-rated section and there was no indication of the commissions paid Cusack. A second set of Schedule A forms for 1978 were submitted at the end of October 1979 on which financial information again was provided under the experience-rated section. These forms indicated an amount held in policyholder reserves. No commissions were noted. After an actuary retained by the Trust requested a more complete accounting from BC/BS and specifically that commissions be indicated, a third set of Schedule A forms for 1978 were submitted in July of 1980. The commissions paid Cusack were reflected on this set of forms. Moreover, the forms stated that the policies were prospectively rated and showed no policyholder reserves. None of the forms were certified. Similarly conflicting sets of Schedule A forms were submitted for 1979. Appellants' Brief at 9–11.

self-dealing by fiduciaries,[2] and Section 408, 29 U.S.C. § 1108, which exempts transactions from this prohibition if no more than reasonable compensation is paid.[3] The Trustees thus urge upon us the conclusion that BC/BS, as a fiduciary under ERISA, was prohibited from accepting unreasonable compensation for its services and, hence, that the approximately $350,000 premium surplus must be returned to the Trust.

Without plunging into the difficult questions raised about the interrelationship of Sections 406 and 408, and of both sections to the more general fiduciary standard provided by ERISA Section 404, 29 U.S.C. § 1104, we note that these obligations are all premised upon the assumption that the party whose duty is asserted is a fiduciary under ERISA with respect to the conduct alleged. Our preliminary inquiry, therefore, must be whether BC/BS was a fiduciary in relation to the conduct alleged here.

Congress took a functional approach to defining who was to be treated as a fiduciary under ERISA, providing in 29 U.S.C. § 1002(21) that:

a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

Thus the obligation alleged in the case before us under Sections 406 and 408 govern BC/BS only if we find that BC/BS exercised discretionary authority or control with respect to the Plan, and specifically with respect to the rates agreed to by the Trustees.

█ We think that BC/BS does not exercise discretionary authority with respect to the setting of rates. Before entering into the Contract which included the rates alleged to have provided it with unreasonable compensation, BC/BS had no relationship to the Trust at all. After competitive bidding, BC/BS was selected as medical carrier presumably because its premium rate of $86.15 per month per Plan participant was more favorable than the other bids submitted. At any rate, BC/BS had no control over what plan and what hospital service organization were chosen for the Trust.[4] After

---

**2.** Section 406(a) of ERISA provides in pertinent part that:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

\* \* \* \* \* \*

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

. . .

29 U.S.C. § 1106(a)(1).

**3.** Section 408 of ERISA provides in pertinent part that:

(b) The prohibitions provided in section 1106 of this title shall not apply to any of the following transactions:

\* \* \* \* \* \*

(2) Contracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor.

\* \* \* \* \* \*

(c) Nothing in section 1106 of this title shall be construed to prohibit any fiduciary from—

\* \* \* \* \* \*

(2) receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan; . . .

29 U.S.C. § 1108(b), (c).

**4.** This fact distinguishes this case from *Brink v. DaLesio,* 496 F.Supp. 1350 (D.Md.1980), *rev'd in part, aff'd in relevant part,* 667 F.2d 420 (4th Cir.1981), in which an insurance broker was found to be an ERISA fiduciary for purposes of requiring and ensuring that the amount of compensation he received was reasonable. The reason for his acquiring this status was that he was solely responsible for formulating the specifications when bids were solicited, he made the initial decision whether bids were to be solicited and he analyzed the bids and presented his advice to the trustees of a welfare fund. *Id.* at 1374–75. Thus he clearly exer-

the Contract was signed, BC/BS may have come into a fiduciary relationship to the Trust with respect to the processing of claims, the area over which BC/BS had discretionary authority. Yet it still did not have any control over what organization would be chosen to fulfill these functions in the following year or on what terms—except to the extent that BC/BS rendered its service in such a manner and at such a price that a more attractive competitor did not submit a bid and take these functions away from it. As to the terms and conditions upon which it became a provider, therefore, BC/BS entered into an arm's length bargain presumably governed by competition in the marketplace. Ordinarily BC/BS would not be a fiduciary with respect to these matters. We hold, therefore, that BC/BS was not a fiduciary under ERISA with respect to the selection of a hospital service organization and as to its compensation as a provider of Plan benefits. Hence, BC/BS did not in these respects incur the obligations of a fiduciary. The responsibility for ensuring a prudent choice among Plans—in 1978, as in 1979 and in 1980 (when BC/BS was terminated as carrier)—rested upon the Trustees.

■ The Trustees' second ERISA claim is based upon the provision of incomplete, inaccurate and uncertified information by BC/BS in the various forms and reports supplied to the Trust. These claims are linked to the charges based on unreasonable compensation, because the Trustees assert that they cannot monitor the service provided by BC/BS without accurate information as to commissions paid and premiums retained. However, since we have held that BC/BS did not have the status of a fiduciary with respect to the selection and compensation of a hospital service organization, we cannot evaluate the Trustees' allegations of reporting violations according to the generalized ERISA fiduciary standards.

Instead, both the measure of BC/BS's obligations in this respect and the appropriate penalties for failure to perform these obligations must be sought in the ERISA reporting provisions themselves.

BC/BS's obligation to provide information to the Trust for inclusion in the reports which must be submitted by the Trustees arises under Section 103 of ERISA:

(a)(2) If some or all of the information necessary to enable the administrator to comply with the requirements of this subchapter is maintained by—

(A) an insurance carrier or other organization which provides some or all of the benefits under the plan, or holds assets of the plan in a separate account,

\* \* \* \* \* \*

such carrier ... shall transmit and certify the accuracy of such information to the administrator within 120 days after the end of the plan year....

29 U.S.C. § 1023(a)(2). Section 103(e) then describes the information which an insurance carrier is required to provide:

a report under this section shall include a statement from such insurance company, service, or other similar organization covering the plan year and enumerating—

(1) the premium rate or subscription charge and the total premium or subscription charges paid to each such carrier, insurance service, or other similar organization and the approximate number of persons covered by each class of such benefits; and

(2) the total amount of premiums received, the approximate number of persons covered by each class of benefits, and the total claims paid by such company, service, or other organization; dividends or retroactive rate adjustments, commissions, and administrative service or other fees or other specific acquisition costs paid by such company,

cised with regard to the selection of a plan the kind of discretionary authority contemplated by the statute, unlike the situation in the case at hand where BC/BS had no role on behalf of the Plan in the selection of a hospital service organization for the Plan. (Under Iowa law,

BC/BS is technically not an insurance company but rather a "hospital service corporation." *See* Iowa Code § 514.1. The distinction is of no relevance either to this case or to BC/BS's obligations under ERISA.)

service, or other organization; any amounts held to provide benefits after retirement; the remainder of such premiums; and the names and addresses of the brokers, agents, or other persons to whom commissions or fees were paid, the amount paid to each, and for what purpose.

29 U.S.C. § 1023(e).

■ There is little question that BC/BS failed to comply with these requirements in this case. For example, all the Schedule A's submitted were uncertified, and on several forms they failed to note the commissions paid to Cusack. Yet Section 103 does not specify a penalty for failure to comply with these requirements. *Redwood Bank v. QTA, Inc.,* BEN. & PENS. REP. (BNA) No. 266, at D–6 (N.D.Cal. Oct. 23, 1979), cited to us by appellants as supporting the imposition of a fiduciary standard upon the performance of the ERISA reporting requirements by a party to whom these duties were delegated by a trustee, suggests that one appropriate remedy is an accounting. In *Redwood Bank* the court enjoined an audit of the records and accounts relating to the plans involved and ordered the offending party to allow the plaintiff full access to all such books, records, and accounts. We think such a remedy is appropriate, given the purpose which the ERISA reporting requirements were presumably intended to serve: to disclose sufficient information to the Secretary of Labor and to both plan administrators and beneficiaries to allow them to monitor and to enforce the substantive provisions of the statute.

■ In the case at hand, an accounting would serve no purpose, since the necessary corrected information has already been provided. As the Trustees concede, all of the absent data eventually was supplied by BC/BS on amended Schedule A forms. For example, the payment of commissions to Cusack was noted on the second amended Schedule A form for 1978, submitted in July of 1980, and on the amended form for 1979 as well. In any case, the Trustees had actual knowledge of the fact that Cusack was being paid a commission by BC/BS, for this was the arrangement upon which they themselves had insisted in their 1977 letter appointing him as their broker.[5]

As to the reporting of the "policyholder reserves,"[6] the reports are indeed somewhat confusing as to how and where the amount of excess premiums is listed and described. However, the Trust concedes that $317,000 was listed as reserves on the second set of forms submitted for 1978. Appellants' Brief at 15. In any event, the fact that BC/BS's income from premiums exceeded the claims paid out by a substantial amount can be gleaned from the forms; and this is presumably the information which is relevant to the Trust's ERISA claims.

■ It is true that the forms submitted by BC/BS remained uncertified from start to finish. However, given that all the requisite information was ultimately supplied to the Trustees (including sufficient information to allow them to bring this lawsuit), we cannot see that the Trustees have in any way been injured by these technical violations of the statute. More importantly, without additional circumstances which are simply not present here, we do not see how reporting violations could give rise to a claim based on a different understanding of the compensation arrangements between the parties, since there is no causal connection between alleged excessive compensa-

---

5. Cusack has also stated in a letter supported by an affidavit to the Trustees' counsel that his 1% commission or brokerage fee was known to all parties. Exhibit 1 to Reply Memorandum in Support of Defendants Blue Cross and Blue Shield of Iowa's Cross Motion for Summary Judgment.

6. The simple claim that the amounts of excess premiums, although noted on the forms, are not described as reserves held for the benefit of the Trust begs the question at issue in the lawsuit: to whom does this money belong? For ERISA reporting purposes, all that is relevant is that the excess was made apparent to the Trustees, enabling them, for example, to bring this action.

tion and the defective reporting here.[7] Hence, we approve the action of the district court in dismissing all the ERISA claims.

### III

Appellants raise two claims based on the Contract, both targeted upon the trial court's refusal to consider extrinsic evidence which they allege would show that the Contract was intended to be retrospectively rated and thus that they are entitled to a refund of all the premium surplus. Their first argument is that the Contract, embodied in the two letters exchanged between the Trustees (or their broker, Cusack) and BC/BS, together with the Service Agreement, is ambiguous and thus requires interpretation in the light of extrinsic evidence. This ambiguity arises, they contend, not from what is in the Contract but from what is left out—that is, from its silence as to the rating system to be employed.

■ This argument strikes us as somewhat wide of the mark. The test under Iowa law for ambiguity of a contract is whether its language is fairly susceptible of more than one interpretation.[8] *See, e.g., Farm Bureau Mutual Insurance Co. v. Sandbulte,* 302 N.W.2d 104, 108 (Iowa 1981). Yet what appellants specifically complain of here is not that the contract as written is susceptible of more than one interpretation but that it omits a term. This alleged deficiency is more appropriately analyzed under appellants' second argument—that the Contract does not represent a complete integration of the agreement between the parties.[9]

The contention that the Contract here is only a partial integration of the parties' agreement appears plausible. Before the parties embarked upon performance (the Plan went into effect on December 31, 1977), only two relatively brief letters had been exchanged between them. Although they apparently agree that the Contract between them is represented by these two letters and the Service Agreement, the latter, a detailed description of the benefits to be provided, was not executed until nearly one year later—after almost 11 months of performance under the Contract. It is reasonable to conclude, at least with respect to the Contract for 1978, that the two documents then in existence did not contain a full recital of the terms of the parties' agreement.

However, even assuming for the moment that the Contract here was only partially integrated, appellants do not allege that there are any other written or oral agreements contemporaneous with it. Instead, their strongest argument is one based upon trade custom. They assert that most "Taft-Hartley" plans (like this one) are experience-rated, supporting this assertion with an affidavit from Richard A. Rezek, Senior Vice-President of an actuarial consulting firm which has dealt with over 2,000 such trusts and which was retained by the Trust in late 1979. Mr. Rezek states that most such contracts are retrospectively rated and that the evidence here (*e.g.,* the manner in which information was provided on the Schedule A forms) leads him to conclude that this one was as well. Appellants thus argue that the Contract in suit was entered into in light of a trade custom to rate retrospectively, and that this custom is an implied term of the Contract.

■ However, a party seeking to rely upon trade usage must establish both that

---

7. Although the appellants claim they did not know of the retention by BC/BS of substantial policy reserves until apprised of this fact by an actuary, this claim is not germane to the question (which we discuss below) of what the Contract provided. As to the claims based on ERISA, appellants do not allege (and indeed could not, in light of the filing of this lawsuit) that they were so misled by the reporting violations as to be unable to enforce their rights under ERISA.

8. The parties agree that Iowa law governs construction of the Contract, because it was executed in Iowa and the Trust is located there.

9. The most appropriate analysis might be to determine whether a term had been omitted because the parties had not foreseen the possibility of a surplus, *see* E. Farnsworth, CONTRACTS § 7.15 (1982), but appellants apparently are arguing that the Contract was intended to be retrospectively rated from its inception.

the custom is so widespread that knowledge of it can be presumed and that the parties in fact acted in reliance upon it. *Ballagh v. Polk-Warren Mutual Insurance Ass'n,* 257 Iowa 1334, 136 N.W.2d 496, 499 (Iowa 1965). In this case, however, the appellees have submitted affidavits from both of the individuals who acted as negotiators for the parties, and both state that they did not assume or intend that the Contract was to be retrospectively rated. Cusack, the Trust's broker, has stated that:

> It was my understanding in the fall of 1977, when the contract was negotiated, BCBS of Iowa had not yet filed for a retrospective rating with the Iowa Commissioner of Insurance, and therefore only prospective rating was currently available from them.
>
> In that time frame and with the other circumstances prevailing retrospective rating was not an issue.

Exhibit 1 to Reply Memorandum in Support of Defendants Blue Cross and Blue Shield of Iowa's Cross Motion for Summary Judgment. Mike Stoll, BC/BS's representative in the negotiations, has submitted an affidavit to the effect that:

> It was my intention as a representative of Blue Cross and I understood it to be the Trust's intention that the contract agreed to by the Trust on December 6, 1977, called for straightforward payment of guaranteed monthly premiums by the Trust and did not involve refunds, dividends, return of surplus premiums nor any other financial arrangement qualifying the Trust's monthly payment obligations.

Exhibit 2 to *id.* Stoll also attested that BC/BS did not have *any* retrospectively rated contracts in force at the time the Contract in question was made. *Id.* Thus the argument that the alleged trade usage was an implied term of this contract is contradicted by direct evidence of the intent of the individuals who negotiated it.

The rest of the extrinsic evidence which the Trustees claim the district court should have considered is similarly unconvincing. Most of it—the listing of items on different sections of the Schedule A forms, the breakdowns provided on the annual experience reports (which the Trustees claim are consistent with a retrospectively rated contract), and the premium rates in the 1980 contract [10]—is, of course, not direct evidence of the intent of the parties at the time the Contract was executed but is rather offered as evidence of a course of performance or "practical construction," *see* Farnsworth, CONTRACTS at § 7.13, showing a trade custom incorporated by implication in the contract.

While it is true that Iowa courts often adopt the parties' own construction of a contract as displayed by their performance under it, *see, e.g., Ackerman v. Lauver,* 242 N.W.2d 342, 347 (Iowa 1976); *Goering v. Jefferson,* 159 N.W.2d 409, 412 (Iowa 1968), the evidence submitted here hardly seems probative of the propositions which it is intended to support. It is true that the premium surplus amount is listed on the Schedule A forms inconsistently as "policyholder reserves" or "income exceeding expense" or "retention charges" and that the information on the forms is sometimes provided on the section captioned "experience-rated"—by far the largest space provided on the forms. These inconsistencies seem indicative, however, of nothing more than simple mistakes in executing the forms. Moreover, the fact that more (and more detailed) information was provided by BC/BS than was perhaps required for a prospectively rated arrangement is not at all probative that the Contract incorporated the alleged trade custom to rate retrospectively; the detailed breakdowns are useful for a consumer of either type of plan in evaluating the performance of a hospital service organization. In any event, we can-

---

**10.** The additional fact that the Trustees sought a guaranteed rate under which the Plan would be at no risk seems to support the conclusion that the Contract was for a fixed rather than an adjustable sum; at any rate, Cusack, to whom the Trustees communicated this desire, apparently was persuaded that only such fixed rate, prospectively evaluated, plans were available from BC/BS at that time.

not see how any of the entries on these accounting forms could be considered relevant to the question whether the Contract incorporated by implication the alleged custom of trade. Finally, as to the argument based on the rates set in the contract for the year 1980, we think it improper to consider these rates at all, since the parties expressly agreed that the 1980 Agreement would not prejudice either party's rights as to the previous two years.

In sum, the evidence here of trade usage is inconclusive, and the evidence of intent of the negotiators to *this* Contract (which is uncontradicted) negates any assumption that the Contract had an implied term requiring retrospective adjustment. The Trustees have simply failed to raise any question of fact as to the incorporation of trade custom. Moreover, the evidence based on course of performance is totally unconvincing and cannot support a conclusion based on practical construction in the face of direct evidence that the parties who negotiated the contract intended it to be based upon a fixed rate.

We therefore affirm the judgment of the district court granting summary judgment to BC/BS.