93 F.3d 1088
 Pens. Plan Guide (CCH) P 23924R
Ronald J. SREIN, Plaintiff-Appellee,
v.
SOFT DRINK WORKERS UNION, LOCAL 812, also known as Teamsters
AFL-CIO Local 812, Soft Drink and Brewery Workers Union;
Local 812 Group Insurance Account Trust Fund; Anthony
Rumore, Thomas Rosano; Louis Didio; Louis Rumore; John
Russo; Joseph Vitta; Anthony Vinci and Theodore
Hutchinson, as Trustees of the Local 812 Group Insurance
Plan Account Trust Fund, Defendants-Appellees,
Cigna Employee Benefits Services, Inc.; Connecticut General
Corporation and Cigna Holding Inc., Defendants-Appellants.
 No. 907, Docket 95-7658.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 26, 1996.
Decided Aug. 28, 1996.
 
 Thomas A. Martin, New York City (Beverly M. Barr, Michael P. Collins, Putney, Twombly, Hall & Hirson, New York City, of counsel), for Defendants-Appellants.
 James L. Griffith, Wolf, Block, Schorr and Solis-Cohen, Philadelphia, PA, for Plaintiff-Appellee.
 William J. Rodgers, Washington, DC (Thomas A. Thompson, Collier, Shannon, Rill & Scott, Washington, DC, of counsel), for Defendants-Appellees.
 Before JACOBS, LEVAL, and PARKER, Circuit Judges.
 JACOBS, Circuit Judge:
 
 
 1
 Defendants CIGNA Employee Benefits Services, Inc., Connecticut General Corp. and CIGNA Holding Inc. (collectively "CIGNA") entered into a contract to provide insurance and insurance services for the Local 812 Group Insurance Account Trust Fund (the "Trust Fund"). (The Trust Fund, an employee benefits program; Soft Drink Workers Union Local 812, the union whose members are participants in the Trust Fund; and eight trustees of the Trust Fund are collectively referred to herein as "Local 812" or "the Union.") Prior to the insurance contract, CIGNA had made an oral contract with plaintiff Robert J. Srein to pay him a brokerage commission (or finder's fee) of two percent on all premium payments that Local 812 would make under the contract, including millions of dollars of premium equivalency payments that funded Local 812's self-insured retention for the members' health insurance. CIGNA has taken the position throughout this litigation that the commissions due to Srein in respect of the self-insured retention could not be paid without Local 812's consent. A litigation in state court ensued when Local 812 refused to give such consent and instead asserted a claim to the funds in the account from which CIGNA intended to pay the commission. Following the commencement of that litigation, CIGNA and Local 812 entered into a settlement agreement pursuant to which CIGNA paid Local 812 the money that it claimed, and Local 812 undertook to indemnify CIGNA for the commissions CIGNA might be compelled to pay Srein (the "Settlement Agreement").
 
 
 2
 Srein commenced this diversity action in the United States District Court for the Southern District of New York, alleging that CIGNA breached its oral contract to pay the brokerage commission and that Local 812 induced the breach; CIGNA cross-claimed against Local 812 on the indemnity. Judge Brieant entered summary judgment against CIGNA on Srein's claim for commissions, and entered summary judgment in favor of Local 812 on CIGNA's indemnity claim, voiding the indemnity clause of the Settlement Agreement between CIGNA and Local 812.
 
 
 3
 We affirm for many of the same reasons adduced by the district court.
 
 BACKGROUND
 
 4
 The Trust Fund is an employee welfare benefit plan subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001-1461. The Trust Fund furnishes a variety of benefits to its members (including medical and disability insurance), some or all of which are funded by the employers pursuant to collective bargaining agreements. In 1988, following an arbitration in which it unsuccessfully sought higher employer contributions to its health plan, Local 812 encountered difficulty finding an insurer that would offer a satisfactory and affordable health benefits program. One of the bottling companies that employed members of Local 812--Canada Dry Bottling Company of New York--became aware of Local 812's insurance problems and approached Srein, an insurance consultant, to see if Srein could find a plan that would meet Local 812's needs. Srein had previously developed and marketed insurance benefits programs for Canada Dry as well as for other bottling companies that bargained collectively with Local 812.
 
 
 5
 Srein thereupon approached David Johnson, a senior account executive at CIGNA with whom Srein had had previous dealings on a commission basis. Following Srein's initiative, Johnson sent a letter to Local 812 in May 1988 seeking information that would permit CIGNA to provide quotations on health benefits. CIGNA contends that the following passage in that letter demonstrates Local 812's awareness that Srein was acting as broker for Local 812 in the ensuing transaction:
 
 
 6
 This letter also authorizes you to send this data to Mr. R.J. Srein.... This can be the original information, or copies, as Mr. Srein will be "driving" the program development.
 
 
 7
 Srein and CIGNA agreed that, if Local 812 accepted the proposed plan, Srein would receive a two-percent commission on all premium payments by Local 812 under the plan. Johnson testified in his deposition that he always dealt with outside brokers such as Srein in the sale of group insurance for such risks as medical care and disability. Johnson also testified that the "total rate" quoted to prospective policyholders for such plans included an allocation for CIGNA's administrative costs and profit as well as the brokerage commission.
 
 
 8
 Although Johnson's May 1988 letter to Local 812 said that Srein would be " 'driving' the program development" (whatever that means), Srein deliberately kept in the background during CIGNA's negotiations with the union, because Srein was strongly identified with management. Thus, when the CIGNA plan was presented to the Trustees of Local 812 on March 16, 1989, Srein did not attend. As CIGNA puts it in its brief:
 
 
 9
 Mr. Srein did not attend the [March 16] meeting at his own specific request. Apparently, Mr. Srein had previously represented management groups in the soft drink industry and felt Local 812 would not react positively to his presence at this meeting.
 
 
 10
 In deposition, Johnson admitted that, when he prepared a standard-form "Application for Group Insurance" for Local 812, he did not identify Srein as the "soliciting agent," as he normally would have done. Moreover, Johnson did not disclose to Local 812 during negotiations that the rate quoted for the CIGNA plan included a commission for Srein. In a letter to Local 812 dated February 23, 1989, Johnson wrote that the amount attributable to "fixed expenses" would "cover our handling of the claims, printing your booklets, ID cards, providing you with utilization reports, alphabetical listings, etc.," but he omitted to mention that these "fixed expenses" also included Srein's commission.
 
 
 11
 By the end of March 1989, Local 812 accepted CIGNA's proposed insurance program, and the parties entered into an insurance agreement effective April 1, 1989. In a letter to Johnson dated May 12, 1989, Local 812's consultant, Martin E. Segal Company, requested a breakdown of "principal retention components," such as "state premium taxes, commissions, interest credits on cash flow and reserves, administration and expenses." Johnson responded in a letter dated September 22, 1989, nearly six months into the policy term. Near the end of the letter, Johnson wrote:
 
 
 12
 I did want to confirm in our conversation that Ron Srein is the broker of record on this case as he is the one who brought me into it. Ron is also the broker of record on Pepsi Cola of New York, Canada Dry, Seven-Up, and RC Acquisition. Ron was very instrumental with us in writing this piece of business due to his relationship with CIGNA over the last decade. It was his evaluation of plan design and claims that enabled us to make a competitive offering to the executive committee.
 
 
 13
 The September 29, 1989 letter does not mention (in so many words) a commission for Srein. In a letter to Srein dated December 14, 1989, Johnson indicated that Local 812's only response to the information about Srein's involvement was asking "whether [Local 812] would have to pay additional monies to cover your compensation and I told [Local 812] that it was included in the fixed expense [it] is paying to me."
 
 
 14
 The program adopted by Local 812 in March 1989 consisted of policies for group medical, dental, life and accidental death and dismemberment insurance. The premiums disputed in this litigation were incurred in connection with the medical and dental plans.
 
 
 15
 The overall design of the medical and dental plans was that Local 812 would be self-insured up to a retention (limit) of $125,000 per claim, and that CIGNA would furnish claims-handling services for all claims, plus insurance coverage to the extent that any single claim exceeds the retention. The plan was funded by two kinds of payments from Local 812--"premium equivalency" payments and "residual" payments--as explained below.
 
 
 16
 A. "Premium equivalency" payments funded the payment of claims that were within Local 812's self-insured retention. Local 812 made monthly premium equivalency payments into its own "imprest" account to be drawn down by payments to CIGNA as CIGNA paid claims within the self-insured retention. It appears that all funds that Local 812 was required to transmit from this account were duly transmitted to CIGNA, and that any sums remaining in the imprest account were duly retained by Local 812. The premium equivalency payments added up to $11,572,835.[1] The two-percent commission owing to Srein on these premium equivalency payments, totalling $231,456.70, was not promptly paid by CIGNA and became the subject of controversy and litigation.
 
 
 17
 B. "Residual premium" payments funded the excess insurance coverage, the handling of claims and administration, the cost of claim-related litigation, and other expenses, as well as CIGNA's profit. Of the $46.79 monthly residual payment per participating union member, $7.98 constituted the excess insurance premium, leaving $38.81 for all other purposes. Out of these amounts, CIGNA paid itself the $7.98 per capita monthly premium for the excess coverage, reimbursed itself for the reasonable costs of claims handling, administration and litigation, and took a profit. After the policy expired, $476,470.20 remained of the residual premium payments. CIGNA deposited this remainder into a bookkeeping account called the "premium stabilization reserve." Of this $476,470.20, the parties do not dispute that $139,534.84 is a fair estimate of the amount needed by CIGNA for the administration of the handling of claims (designated "runout claims") that were actuarially predicted to be filed in the future. It is CIGNA's position that Srein's commission should be paid out of the remaining $327,935.36 in this account, but that Local 812 improperly refused to furnish a written consent that, according to CIGNA, was necessary under New York law.
 
 
 18
 The policy, which was subject to New York law, was in effect for a single twelve-month period ending on March 31, 1990. During that time Local 812 paid CIGNA a total of $13,141,345 in residual premium and premium equivalency payments. Srein received the commission on the residual premiums (as well as on the premiums for the life, accident and disability coverages that are not at issue in this lawsuit). CIGNA proceeded to calculate Srein's commission on the premium equivalency payments, but advised Srein that, under N.Y. Ins. Law § 2119, CIGNA could not pay him that commission without written authorization from Local 812. CIGNA considered Srein to be the broker of record (i.e., Local 812's agent) for this account, and N.Y. Ins. Law § 2119 prohibits an insurance broker from receiving compensation from a policyholder for negotiating an insurance contract (other than commissions deductible from premiums) unless the policyholder consents specifically and in writing to such compensation. CIGNA repeatedly asked Local 812 to furnish such a consent, but Local 812 never did so. CIGNA, invoking § 2119, refused to pay Srein the remaining $231,456.70 in commissions.
 
 
 19
 On March 22, 1993, Local 812's secretary-treasurer and five trustees of the Trust Fund sued CIGNA in New York State Court seeking to recover $377,935.64, which sum (it was erroneously alleged) represented the funds remaining in CIGNA's premium stabilization reserve.
 
 
 20
 In a letter dated April 21, 1993, Gisele M. Molloy of CIGNA's legal department advised Local 812 that the current balance in the premium stabilization reserve was $327,935 (apparently net of the reserve for runout claims), and that $251,750 of that balance was owed to Srein, leaving $76,185 as funds "likely not related to Mr. Srein's claim." Molloy offered to settle the state court lawsuit by distributing $76,185 to Local 812, in return for which Local 812 would (1) agree to indemnify Connecticut General for any liability relating to Srein's commission that exceeded $251,750; and (2) release Connecticut General for all claims except Local 812's claim for the $251,750 retained by Connecticut General. Her letter continued:
 
 
 21
 If [Local 812] is unwilling to agree to the above conditions, Connecticut General will have no choice but to deposit the entire balance of the [premium stabilization reserve] into court and the entire balance will be unavailable to [Local 812] until this matter is resolved sometime in the future.
 
 
 22
 Molloy's letter disavowed any obligation on CIGNA's part "to return the [premium stabilization reserve] funds to [Local 812] until the commission dispute is resolved...."
 
 
 23
 On June 10, 1993, Local 812 and CIGNA executed the Settlement Agreement that resolved the state court lawsuit. This agreement was worked out between the parties at what Molloy calls an "in-face negotiation." The Settlement Agreement provided that: CIGNA would pay $327,935.84 to Local 812; Local 812 would indemnify CIGNA if a "party" seeking commissions is successful in litigation; Local 812 would release CIGNA from all claims involving the insurance agreements (except for CIGNA's obligation to furnish computer tapes on the runout claims and any dispute that may arise from Local 812's review of those tapes); and the state action would be withdrawn with prejudice.[2]
 
 
 24
 On January 25, 1994, Srein commenced this diversity action in the Southern District of New York. His amended complaint, filed on June 23, pleads that CIGNA breached its contract to pay commissions, and that Local 812's withholding of consent to that payment constituted intentional interference with Srein's contractual arrangement with CIGNA. The amended complaint also alleged fraud, conspiracy, unjust enrichment, bad faith, negligence, promissory estoppel and various claims in equity seeking money and an accounting. CIGNA cross-claimed against Local 812, alleging that any recovery by Srein would be attributable to intentional acts and wrongdoing by Local 812 in "fail[ing] to execute the requisite transfer letter agreement necessary to pay commissions." The cross-claim also invoked the indemnification clause of CIGNA's settlement agreement with Local 812.
 
 
 25
 On motions for summary judgment by all parties, the district court ruled, first, that the obligation to pay Srein's commission was CIGNA's alone, and that therefore CIGNA had no right or obligation to delay the payment of the remaining commission to Srein pending receipt of consent by Local 812:
 
 
 26
 This court concludes that [New York Insurance Law § ] 2119 does not bar payment of commissions by an insurance company out of its own computed profits as a result of its agreement with an individual for services, including the valuable service of developing an insurance plan and identifying a previously unknown customer for such a plan. If an insurer promises to pay a certain commission to a finder, the insurer may not attempt to evade liability by alleging that the commission must ultimately be paid by the insured.
 
 
 27
 Summary judgment was thus entered in favor of Srein and against CIGNA on the contract claim, together with prejudgment interest from April 1, 1993. Second, the district court voided the indemnification agreement on a variety of grounds, including breach of fiduciary duty.
 
 DISCUSSION
 
 28
 A. Commissions: Srein versus CIGNA.
 
 
 29
 CIGNA does not dispute that it entered into an oral contract with Srein to pay a two-percent commission on all premiums--the premium equivalency payment as well as the residual payments and the premiums on other coverages (such as life, accident and disability). Nor does CIGNA dispute that, if Local 812 had furnished written consent to the payment, CIGNA would have paid promptly the commission Srein claims. CIGNA's sole defense to Srein's claim is that the funding mechanism employed for this insurance program, "coupled with Mr. Srein's claims for commissions based on these 'premium equivalencies,' triggered the application of § 2119 of the New York Insurance law." Specifically, CIGNA states in its brief that it "declined to pay commissions to Mr. Srein which were to be calculated on 'premium equivalencies,' because Local 812 did not execute and has refused to execute a signed writing which authorizes the payment of such funds." The statutory text on which CIGNA relies is as follows:
 
 
 30
 (c)(1) No insurance broker may receive any compensation, other than commissions deductible from premiums on insurance policies or contracts, from any insured or prospective insured for or on account of the negotiation or procurement of, or other services in connection with, any contract of insurance made or negotiated in this state or for any other services on account of such insurance policies or contracts, including adjustments of claims arising therefrom, unless such compensation is based upon a written memorandum, signed by the party to be charged, and specifying or clearly defining the amount or extent of such compensation.
 
 
 31
 . . . . .
 
 
 32
 (d) No insurance broker shall, in connection with the negotiation, procurement, issuance, delivery or transfer in this state of any contract of insurance made or negotiated in this state, directly or indirectly charge, or receive from, the insured or prospective insured therein any greater sum than the rate of premium fixed therefor by the insurer obligated as such therein, unless such broker has a right to compensation for services created in the manner specified in subsection (c) hereof.
 
 
 33
 N.Y. Ins. Law § 2119(c)-(d) (McKinney 1985) (emphasis added). We agree with the district court that CIGNA's argument "is based upon an apparent misreading" of this text. The court found that CIGNA's insurance program was "sold competitively based upon estimated costs, profit and overhead" and that the monthly fee of $46.79 per union member "covered ... the commission which CIGNA had agreed to pay to Mr. Srein prior to the acceptance" of the plan, as well as the excess insurance premium, CIGNA's overhead costs, claims handling and other expenses. Thus, the district court held that "[i]n economic fact and as a matter of law, Srein's commission, because it is part of the agreed competitively priced capitation fee [$46.79], is being paid by CIGNA out of its own profits and not by the Union Trustees." (Emphasis added.)
 
 
 34
 The oral contract that created the obligation to pay Srein was entered into between CIGNA and Srein, without the involvement of Local 812. The statute, which operates as a bar only as to payments from an "insured or prospective insured," therefore does not apply. "There is no indication that it was intended to govern agreements between a broker and persons other than an insured." Metz v. National Adjustment Co., 89 Misc.2d 1067, 1069, 393 N.Y.S.2d 527, 529 (Dist.Ct.1977) (discussing N.Y. Ins. Law § 129, recodified as § 2119 in 1984). The legislative history of § 2119, which reflects an understanding that brokers are ordinarily compensated by insurance companies, demonstrates that § 2119 was enacted to prevent a broker from seeking additional compensation from an unsuspecting policyholder; the statute does so by requiring that agreements to such additional amounts be written, subscribed and explicit. See Aeropulse, Inc. v. Armstrong & Brooks, Ltd., 740 F.Supp. 938, 946-47 (E.D.N.Y.1990) (discussing legislative history). The fact that CIGNA, having negotiated a commission percentage, factored it into the price quoted to Local 812 does not mean that the commission, when paid by CIGNA, would be "receive[d]" by Srein "from any insured." Thus, § 2119 does not hinder CIGNA from paying Srein the agreed commission, regardless of where CIGNA intended to get the money to pay him.
 
 
 35
 On the other hand, the statute does bar CIGNA from paying Srein's commission out of funds from Local 812, unless the commission is deductible from premiums received, or Local 812 gives written consent. As the district court found, Local 812 did not even have a brokerage relationship with Srein, who was kept under wraps during the insurance negotiations. Nor is there any other basis for any obligation on the part of Local 812 to underwrite CIGNA's agreement to pay Srein. CIGNA reiterates the argument it made to the district court that Local 812 understood that Srein was acting as its broker, because Johnson's May 1988 letter to Local 812 asked Local 812 to send Srein information needed to "provide quotations" for Local 812's insurance program, and stated in a dependent clause that "Mr. Srein will be 'driving' the program development." The district court, noting this "ambiguous" language, found that "this letter does not make Mr. Srein a 'broker' for Local 812 or the Union Trustees...." We agree. CIGNA denies Local 812's assertion that Srein's role was concealed from the union, but concedes that Srein's participation in the policy negotiations was (at least) downplayed because of potential union hostility or mistrust toward a consultant who was closely identified with management. Moreover, CIGNA's quotation to Local 812 was not itemized to indicate that any part of the premium was attributable to brokerage fees. The record supports the district court's finding that Srein was never Local 812's broker or agent, and none of this record evidence is effectively contradicted by Johnson's May 1988 letter.
 
 
 36
 Section 2119 does not prevent or inhibit CIGNA's compliance with its contractual undertaking to pay Srein; it merely bars CIGNA from paying that money to Srein out of the premium stabilization reserve if the funds in the premium stabilization reserve belong to Local 812.[3] Since CIGNA's obligation to pay Srein is established, we affirm the judgment in favor of Srein.
 
 
 37
 B. Indemnification: CIGNA versus Local 812.
 
 
 38
 The district court held that CIGNA was a fiduciary under ERISA, because it "had authority and discretion with respect to the collection of the funds held in reserve and the time of making refunds to the Union Trustees on termination of the Plan." The court also held that the indemnification agreement is void under § 410(a) of ERISA, which voids as against public policy contractual arrangements that purport to release fiduciaries from their ERISA responsibilities, obligations and duties. The district court also held that the indemnification provision is voidable for failure of consideration; that the April 21, 1993 letter to Local 812 from CIGNA's counsel constituted economic duress; and that New York law prevents a fiduciary from withholding an undisputed payment due to its beneficiary (the $76,185 proffered in CIGNA's letter) in order to induce an indemnification of the fiduciary for unrelated matters.
 
 
 39
 On appeal, CIGNA argues: that the district court's invocation of ERISA § 410(a) to void indemnification misconstrues that statute, because the statute applies to prospective indemnification at the outset or in the course of a fiduciary relationship and does not bar the settlement of a bona fide litigated dispute; that the reciprocal obligations in the Settlement Agreement serve as adequate consideration; that Local 812 failed to establish the elements of economic duress; that many of the grounds of the district court's decision were raised sua sponte; and that Local 812, having accepted all the purported benefits of the Settlement Agreement, should not be permitted now to escape its concomitant undertaking to indemnify CIGNA.
 
 
 40
 Reliance on ERISA § 410(a) to void the indemnification provisions of the Settlement Agreement is problematic. Section 410(a) provides:[A]ny provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy.
 
 
 41
 29 U.S.C. § 1110(a). This wording has been applied to bar the waiver of a future liability, thereby preventing a contracting party from issuing to any fiduciary a license to violate the statute. Leavitt v. Northwestern Bell Tel. Co., 921 F.2d 160, 161-62 (8th Cir.1990). The Department of Labor interprets § 410(a) to prohibit as well "any arrangement for indemnification of a fiduciary of an employee benefit plan by the plan." 29 C.F.R. § 2509.75-4. It is not obvious to us, however, that § 410(a) voids the indemnification clause of the Settlement Agreement (which involved a pending dispute), nor have we found any cases that have fully addressed this specific issue.[4] Courts have not read § 410(a) to prohibit a release that settles a bona fide dispute between an ERISA fiduciary and a plan beneficiary. See, e.g., Leavitt, 921 F.2d at 161-62. Moreover, at least one court of appeals has held that a provision indemnifying a fiduciary absolved of wrongdoing is not nullified by § 410(a). See Packer Eng'g, Inc. v. Kratville, 965 F.2d 174, 175 (7th Cir.1992). We do not find it necessary to decide this issue, however, because we conclude that CIGNA owed Local 812 a fiduciary duty with respect to the premium stabilization reserve funds, and that CIGNA breached that duty in negotiating the Settlement Agreement.
 
 
 42
 CIGNA vigorously disclaims any fiduciary duty as to the payment of Srein's commission. As CIGNA argues (and as the district court apparently found), the two-percent commission on all premium payments was built into the $46.79 per capita monthly residual premium that CIGNA quoted to Local 812, and that Local 812 agreed to pay that premium in arm's length bargaining. Whether or not the two-percent commission--or the resulting $46.79 premium--is reasonable is not a question that arises under ERISA. CIGNA was free to negotiate its premium charges with an eye to its profits, its transaction costs (including Srein's commission), and the competition. CIGNA contends, and we agree, that there was no fiduciary duty under ERISA at that point to negotiate a premium favorable to the Trust Fund. See Schulist v. Blue Cross, 717 F.2d 1127, 1131-32 (7th Cir.1983).
 
 
 43
 From these premises, CIGNA argues that it was entitled to pay Srein out of the funds in the premium stabilization reserve. We disagree.
 
 ERISA defines a fiduciary as follows:
 
 44
 ... a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan....
 
 
 45
 29 U.S.C. § 1002(21)(A). The district court found, and CIGNA does not dispute, that "once Local 812 accepted the Plan, CIGNA became a fiduciary with respect to the Plan and all subsequent dealing with Local 812 regarding the Plan." As the district court observed:
 
 
 46
 Under the Plan in this case, CIGNA had discretionary authority and control over all aspects of the administration of the Plan. CIGNA retained all authority including determinations of the Trust Fund's obligations. CIGNA also had authority and discretion with respect to the collection of the funds held in reserve and the time of making refunds to the Union Trustees on termination of the Plan.
 
 
 47
 (Emphasis added.) To the extent that CIGNA retained control of funds that belonged to Local 812, CIGNA remained a fiduciary to Local 812, even after termination of the insurance plan. See Blatt v. Marshall & Lassman, 812 F.2d 810, 813 (2d Cir.1987) ("We conclude that [defendants] acted as fiduciaries ... because they exercised actual control over the disposition of plan assets."); Greenblatt v. Prescription Plan Servs. Corp., 783 F.Supp. 814, 820 (S.D.N.Y.1992) (citing Blatt to hold that plan administrator's "actual control" over ERISA fund's checking account after termination of plan sufficed to establish fiduciary status).
 
 
 48
 CIGNA repeatedly conceded at oral argument that it had no interest in the funds in the premium stabilization reserve, aside from an amount necessary to cover the costs of administering runout claims plus an amount to pay Srein's commission. More specifically, CIGNA's position was that, after Srein's commission was deducted from the funds in the premium stabilization reserve, the remainder belonged to Local 812. The necessary conclusion from those statements is that, if for some reason Srein's commission could not be deducted from the funds in the premium stabilization reserve, then the entire amount in that account had to be given to Local 812.[5]
 
 
 49
 CIGNA's argument is that it could eventually deduct Srein's commission from the funds in the premium stabilization reserve, because Local 812 had already agreed to pay this amount when it negotiated for the plan in the first place. But CIGNA's insistence throughout that Local 812's waiver was required under N.Y. Ins. Law § 2119 in effect conceded that it had no entitlement to deduct Srein's commission, and that the funds in the premium stabilization reserve (except for the reserve for administering runout claims) are assets of Local 812, and therefore assets of the ERISA plan. We therefore agree with the district court that the sums in the premium stabilization reserve are trust fund assets, and that CIGNA was a fiduciary under ERISA with respect to those assets.[6]
 
 
 50
 "Where fiduciary duties arise under ERISA, they must be enforced without compromise to ensure that fiduciaries exercise their discretion to serve all participants in the plan." John Blair Communications, Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan, 26 F.3d 360, 367 (2d Cir.1994). An ERISA fiduciary must discharge its duties "for the exclusive purpose" of providing benefits to plan participants and their beneficiaries and of defraying reasonable administrative expenses. 29 U.S.C. § 1104(a)(1)(A). In particular, an ERISA fiduciary cannot cause the plan to engage in a transaction that will work "a transfer to, or use by or for the benefit of" the fiduciary "of any assets of the plan," id. § 1106(a)(1)(D), nor can the fiduciary deal with the plan on its own behalf or on behalf of a party whose interests are adverse to those of the plan. Id. § 1106(b)(1), (2).
 
 
 51
 We assume that the payment of Srein's commission out of the premium stabilization reserve might be reasonable if Srein's fee were an obligation of Local 812. However, while state law allowed CIGNA to pay Srein's commission absent a waiver from Local 812, N.Y. Ins. Law § 2119 did bar CIGNA from paying that obligation absent a waiver out of Local 812's funds. Aside from the fact that Local 812 has never given CIGNA its waiver, CIGNA points to no contract provision that allows CIGNA to pay Srein out of the assets of the plan, and we can find none. Johnson's May 1988 letter stating that Srein was "driving" the transaction is altogether insufficient to advise Local 812 that Srein was enlisted as an agent of the union. In fact, Srein and Johnson agreed to downplay Srein's involvement as much as possible in order to improve the chances that Local 812 would accept the plan.
 
 
 52
 CIGNA offers no basis for withholding the funds in the premium stabilization account; thus, on these facts, CIGNA had no right to use the assets of the plan to extract concessions from the Trust Fund that would benefit CIGNA in the state court litigation. We therefore conclude that CIGNA breached its fiduciary duty under ERISA § 404(a)(1)(A) to act for the exclusive purpose of either providing benefits to plan beneficiaries or defraying reasonable administrative expenses. Its conduct is a form of self-dealing and a conflict of interest prohibited under ERISA § 406. See 29 U.S.C. § 1106.
 
 
 53
 Having found that CIGNA breached its fiduciary duty to Local 812 under ERISA, we now consider the appropriate remedy. ERISA provides:
 
 
 54
 (a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries ... shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate....
 
 
 55
 29 U.S.C. § 1109(a). In the exercise of its equitable power, the district court decided that the appropriate remedy for CIGNA's breach is to void the indemnification clause of the settlement agreement. We review that determination for abuse of discretion and find none.[7] See Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 286 (2d Cir.1992); Katsaros v. Cody, 744 F.2d 270, 281 (2d Cir.), cert. denied, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984).
 
 
 56
 We affirm the judgment in favor of Local 812.
 
 CONCLUSION
 
 57
 For the reasons set forth above, we affirm the judgment of the district court.
 
 LEVAL, Circuit Judge, dissenting:
 
 58
 I respectfully dissent from that part of the majority's opinion that affirms the district court's award of summary judgment to Local 812, denying Cigna's claim that Local 812 was obligated under the Settlement Agreement to indemnify Cigna for payment of Srein's commission.
 
 
 59
 The majority's discussion is divided into Part A, which upholds the district court's summary judgment requiring Cigna to pay Srein a 2% commission, and Part B, which upholds the district court's summary denial of Cigna's claim to enforce the Settlement Agreement.
 
 
 60
 I agree with the theory underlying Part B of the majority's opinion. If Cigna conceded that the Trust Agreement required it to return to its insured that portion of the PSR account that exceeded specified expenses plus an agreed level of profit, Cigna would have had no right, in negotiating the Settlement Agreement with its insured, to demand indemnification for Srein's commission as a condition of the release of the insured's funds. Furthermore, in my view, having essentially concealed Srein's role from Local 812, Cigna could not establish, consistent with its fiduciary obligations, that Local 812 had contractually committed to be responsible for Srein's commission. Thus, if the majority had a satisfactory basis for its conclusion in Part B that Local 812 had a right to reimbursement of part of the funds in the PSR account, I would agree that the Settlement Agreement breached Cigna's fiduciary obligations, and Local 812 should not be required to indemnify Cigna for Srein's commission.
 
 
 61
 While I agree with the theory of Part B, the facts are lacking. I see no convincing support for the majority's finding that Local 812 had a call on any of the funds in the PSR account. The majority's attempt in Part B to justify the conclusion that funds in the PSR account "belonged to Local 812," Maj. Op. at 1096, depends on two invalid arguments.
 
 
 62
 First, the majority asserts that "Cigna repeatedly conceded at oral argument that it had no interest in the funds in the premium stabilization reserve, aside from an amount necessary to cover the costs of administering the runout claims plus an amount to pay Srein's commission." Maj. Op. at 1097. I believe the majority has simply misunderstood the significance of Cigna's concession. The reason Cigna has made no claim to the final portion of the PSR account is that in the Settlement Agreement with Local 812 it agreed to let Local 812 have these funds in return for Local 812's commitment to return the funds if necessary to cover any commission entitlement established by Srein. As Srein's commission claim turned out to be less than the full amount in the PSR account, the Settlement Agreement gave Local 812 the balance, which was $76,185. This is what Cigna conceded. Nowhere, however, has Cigna conceded that the funds in the PSR account were plan assets, required to be refunded under the terms of the plan. The majority has taken Cigna's concession, predicated on what Cigna gave up in its Settlement Agreement, and treated it as if Cigna had conceded it never had an entitlement to these funds. Cigna made no such concession.
 
 
 63
 Second, the majority relies on Cigna's contention, asserted in defense of Srein's claim, that New York Insurance Law § 2119 required that Local 812's signature be obtained before Cigna could pay Srein his commission. The majority concludes this amounted to a concession that the funds in the PSR account belonged to Local 812.
 
 
 64
 There was no such concession. What Cigna contended, in a lame effort to defeat Srein's claim, was that § 2119 prohibited the making of a commission payment to Srein out of funds derived from an insured without the insured's consent. The argument is frivolous and was correctly rejected.[1] But, frivolous or not, Cigna's argument was never that Local 812 was entitled under the terms of the plan to the funds in the PSR account; it was merely that because the funds to pay Srein came "indirectly" from the insured, § 2119 required the signed authorization of the insured before payment could be lawfully made. That is not a concession that Local 812 owned any part of the PSR balance. Apart from its misinterpretation of these two "concessions" by Cigna, the majority offers no support whatsoever for its conclusion that the PSR account contained plan assets that Cigna was obligated under the terms of the plan to return to Local 812.
 
 
 65
 In my view, the nature of Cigna's original compensation agreement with Local 812 is not sufficiently explained in the record of the summary judgment motion to permit a confident conclusion whether the PSR account was the exclusive property of Cigna,[2] or whether Local 812 had a right to the reimbursement of any part of these funds.[3] If the former, Cigna was free to contract to pay any part of the account to Srein and to contract to pay other parts to Local 812, in settlement of their dispute, on whatever terms it saw fit. If the latter, the majority correctly asserts that Cigna would violate its fiduciary obligation if it conditioned the return of Local 812's moneys on a promise to indemnify Cigna's obligation to Srein. Trial is needed to answer the question.[4]
 
 
 
 [1]
 CIGNA contends that the district court incorrectly defined the term "premium equivalent" as "all payments by the Trust [Fund], however described." The court found that the "total premium equivalent" was $13,141,345, consisting of $1,568,510 (the amount CIGNA calls the "residual premium"--which Local 812 paid to CIGNA) and $11,572,835 (the amount CIGNA calls the "premium equivalency"--which funded Local 812's self-insurance). We do not use the term "premium equivalent" and instead adopt CIGNA's definition of the term "premium equivalency," which here amounts to $11,572,835. It is undisputed that only the commission on the premium equivalency payments is at issue in this case
 
 
 [2]
 CIGNA thus retained $139,534.36 as a fee for the administration of runout claims
 
 
 [3]
 That proviso is addressed below in the context of CIGNA's indemnification claim
 
 
 [4]
 This issue was considered in somewhat cryptic fashion in Central States, Southeast & Southwest Areas Pension Fund v. Baron, No. 78 Civ. 3702 (N.D.Ill. Mar. 26, 1984) (Lexis). The court held that:
 if it is impermissible for a plan to indemnify or agree to hold harmless a fiduciary for future wrongdoing [under ERISA § 410(a) ], it necessarily must be equally impermissible to exculpate him gratuitously after wrongdoing has occurred, at least until the potential claim against him has in some way been evaluated, in the course of litigation or otherwise.
 (Emphasis added.) Whether this holding provides support for Local 812 is unclear because the effect of the emphasized portion is unclear.
 
 
 [5]
 The dissent finds no outright "concession" by CIGNA that the funds in the PSR account belonged to Local 812 prior to the Settlement Agreement. First, no concession by counsel is needed so long as there is an unrebutted showing. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir.1988)
 Second, on April 21, 1993--prior to the settlement agreement--CIGNA's lawyer, Gisele Molloy, advised Local 812 that CIGNA had no obligation "to return the [PSR] funds to [Local 812] until the commission dispute is resolved ...," and that, unless the union agreed to some interim mechanism, CIGNA "will have no choice but" to lodge the PSR funds with the court during the litigation, "and the entire balance will be unavailable to [Local 812] until this matter is resolved sometime in the future." In short, the commission claim was the only impediment to CIGNA's duty (CIGNA having "no choice") to return the PSR funds to Local 812. The nature of that impediment, CIGNA argued, was that New York Insurance Law § 2119 barred CIGNA's payment of the PSR funds to Srein. As the dissent points out, however, that argument is "frivolous." Dissent at 1099.
 
 
 [6]
 It may be that CIGNA's position on N.Y. Ins. Law § 2119 reflects a failure by CIGNA to understand the nature of its contractual relationship with Local 812. (After all, the program was designed by Srein, not CIGNA). But for CIGNA's position that the premium stabilization reserve funds are funds of Local 812, CIGNA might have treated the $38.81 as a negotiated, non-refundable flat fee, treated the accumulation of those premiums in the premium stabilization reserve as funds belonging to CIGNA, disposed of those funds as it wished to pay Srein, and treated the residuum as profit
 
 
 [7]
 The district court construed the Malloy letter as constituting economic duress under New York law. We do not reach that question. Whether or not Local 812 has established the elements of a duress claim is beside the point. Once one accepts (as the parties do not contest) that the funds in the premium stabilization reserve account belong to Local 812, it was a breach of fiduciary duty under ERISA for CIGNA to withhold part of those funds until Local 812 agreed to indemnify CIGNA in respect of the rest
 
 
 [1]
 In the first place, § 2119(c)(1) contains an express exception for "commissions deductible from premiums." Second, the prohibition of § 2119(d) applies only to payments "of any greater sum than the rate of premium," and Srein's commission was not. Finally, the obligation to pay Srein was simply Cigna's obligation and was not in any way to be borne by Local 812 except to the extent that Cigna had negotiated a fee sufficiently large to cover it. Accordingly, Local 812 is not "the party to be charged," § 2119(a)(1), for the payment of Srein's commission and § 2119 probably has no relevance
 
 
 [2]
 The evidence seems to show that the PSR account represented the remainder of the capitation fees collected by Cigna from Local 812, and that these fees were designed to cover premiums for excess coverage, expenses of claims handling, administration and litigation, and profit. If so, all the funds in the PSR account belonged to Cigna. (As the district court found, "[t]he residue after all costs was Cigna's profit.")
 
 
 [3]
 In response to the arguments asserted by the majority in footnote 5, I do not see how Molloy's letter of April 21, 1993, asserting that Cigna "will have no choice but" to lodge the PSR funds with the court until the rights of the parties are determined in litigation, constitutes a concession that the funds belonged to Local 812
 I agree fully with the majority that no "concession" is needed if the evidence demonstrates conclusively Local 812's entitlement. The problem is that Local 812's entitlement was shown neither by concession nor by evidence.
 Finally, the fact that Cigna's attempt to defeat Srein 's rights by reliance on § 2119 was frivolous has no bearing on Local 812's entitlement to the funds.
 The issue should have been tried.
 
 
 [4]
 The additional reasons given by the district court to justify summary judgment--lack of consideration for the Settlement Agreement and economic duress--were clearly invalid and are not endorsed by the majority opinion