**Thomas O'MALLEY, Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE SERVICE, Respondent–Appellee.**

**No. 91–3470.**

United States Court of Appeals, Seventh Circuit.

Argued May 27, 1992.

Decided Aug. 7, 1992.

Patrick J. Calihan, Chicago, Ill. (argued), for petitioner-appellant.

Abraham N.M. Shashy, Jr., I.R.S., Gary R. Allen, David E. Carmack, Regina S. Moriarty (argued), Dept. of Justice, Tax Div., Appellate Section, Washington, D.C., for respondent-appellee.

Before BAUER, Chief Judge, RIPPLE, Circuit Judge, and WOOD, Jr., Senior Circuit Judge.

BAUER, Chief Judge.

Thomas O'Malley was convicted of bribery and fraud in connection with his activities as a trustee of the Central States, Southeast and Southwest Areas Health and Welfare Fund, and the Central States, Southeast and Southwest Areas Pension Fund ("Pension Fund"). The Pension Fund paid the attorneys' fees and costs for O'Malley's criminal defense. The Fund's payment of these costs is a prohibited transaction under the Internal Revenue Code, 26 U.S.C. § 4975. In this appeal, we determine whether O'Malley is subject to the excise tax imposed by 29 U.S.C. § 4975 upon participants in prohibited transactions with pension funds. The tax court found that O'Malley was subject to the tax. We affirm.

Our statement of the facts draws heavily upon the tax court's opinion, *O'Malley v. Commissioner*, 96 T.C. 644 (Apr. 15, 1991). O'Malley served as an employer trustee of the Pension Fund from 1978 until December 20, 1982. The Pension Fund, a trust fund established to provide retirement and related benefits to members of the International Brotherhood of Teamsters ("Teamsters"), was managed by a board of employer and employee trustees. O'Malley was a member of the Board. Companies doing business in the Central States, Southeast, or Southwest contributed to the Pen-

sion Fund. Contributions were pooled (rather than segregated), and the Fund received contributions from O'Malley's employer, C.W. Transport Company, for approximately 1,800 employees.

The Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 ("ERISA"), did not permit the Fund to compensate O'Malley for his services to the Pension Fund, but it did provide insurance and other benefits. O'Malley's employer also increased his salary when he became a Fund trustee. During his tenure as trustee, and as a union relations director for his employer, O'Malley established contacts with members of the Teamsters.

The Pension Fund purchased a 5.8 acre parcel of property in Las Vegas in 1972. It relinquished managerial control of the land in 1977 to the Victor Palmieri Company. Palmieri decided to sell the land in 1978. A homeowners association attempting to prevent the construction of a high-rise on the property tried to buy it. They selected United States Senator Howard Cannon to lead their efforts. At that time, Senator Cannon was the chairman of a Senate committee considering legislation to deregulate the trucking industry. O'Malley's employer, together with many other members of the trucking industry, opposed the legislation because it threatened to increase competition in the trucking industry. The legislation also threatened the Pension Fund because if trucking companies were forced out of business, their contributions to the fund would cease. Moreover, the Fund feared that newly formed companies would be less likely to hire union employees, so they would not contribute to the Fund either. This would increase the financial burden on the remaining contributors.

The homeowners group bid $1,400,000 for the Las Vegas property. Allen Glick, an investor, bid $1,600,000. O'Malley and others connected to the Teamsters and the Fund tried to influence Senator Cannon's position on the trucking legislation by ensuring that Cannon's homeowners group could purchase the Las Vegas property. O'Malley and a former Fund trustee flew to California (using the Teamsters' President's airplane), and persuaded Glick to withdraw his bid. O'Malley's employer did not direct or supervise O'Malley's trip to California.

O'Malley and four other men were indicted on May 22, 1981, for conspiracy to bribe a United States Senator, and related charges. After he was indicted, O'Malley immediately went to see George Lehr, the executive director of the Pension Fund. Trial Transcript at 27 (Testimony of Thomas O'Malley). Lehr recommended that O'Malley contact attorney William Hundley to handle his criminal defense. After Hundley spoke with O'Malley, he called the Pension Fund. The Fund agreed to pay his fees, and Hundley called O'Malley to let him know Hundley would represent him. The record does not indicate who at the Fund spoke with Hundley. With O'Malley's knowledge and approval, the Fund paid $266,280.55 in 1981 and $212,212.34 in 1982 in fees and costs for his defense. The parties contest the precise role that O'Malley played in the retention of his counsel. O'Malley says that he was an entirely passive participant in the Fund's retention of Hundley. In his brief, the Commissioner states: "Taxpayer also participated in the decision to hire attorney William Hundley to represent him in the criminal trial. Taxpayer spoke to Mr. Hundley regarding his representation prior to Mr. Hundley's being hired, and taxpayer subsequently learned that Mr. Hundley's fees would be paid for by the fund." Appellee's Brief at 12–13 (quoted in Appellant's Reply Brief at 4). We do not find relevant differences between the version of the facts urged by O'Malley and the Commissioner's characterization.

The Fund's litigation defense cost policy, adopted in 1978, was based on the trust agreement. The policy provided that the Fund would pay the costs of defense of civil litigation, including reasonable attorneys' fees, for present or former trustees, officers, or employees of the Fund. The Fund would only defend civil litigation arising out of alleged acts or omissions of the trustee, officer, or employee during the course of service to the Fund. As a condition of coverage, the Fund is subrogated to

the covered person's right of recovery against any person or entity for the defense costs the Fund incurs.

The Fund's Board of Trustees granted O'Malley's request to indemnify him, and agreed to pay the defense costs of his criminal indictment at a meeting in June 1981. When the Board voted on the resolution to indemnify him, O'Malley did not vote. At a second meeting, in October 1981, the board changed the Pension Fund's defense cost policy. The retroactive change was "substantially identical" to the old policy except that it now covered criminal litigation defense costs. *Id.* at (App. at 7). O'Malley also abstained from this vote.

In August 1982, the Board, after receiving pressure from the Department of Labor, decided that the Fund would pay no more defense costs on O'Malley's behalf in his criminal case without written notice to the Secretary of Labor and specific authorization by the Board. A jury convicted O'Malley of all counts of the indictment, and he was sentenced to a thirty-month prison term. This court affirmed his conviction. *United States v. Williams*, 737 F.2d 594 (7th Cir.1984), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985).

Two insurers, National Union Fire Insurance Company of Pittsburgh, Pennsylvania, and Midland Insurance Company, ultimately reimbursed the Fund for O'Malley's defense costs. In an earlier proceeding, the tax court determined that the Fund's payment of his legal fees was personal to O'Malley, and, hence, income. 91 T.C. 352 (1988). Nevertheless, O'Malley was permitted to deduct the amounts as ordinary and necessary business expenses of his business as an employee of C.W. Transport.

■ The tax court decided this case upon stipulated facts. Whether the stipulated facts constitute participation under 26 U.S.C. 4975(a) is a question of law, which we review *de novo*. *Merit Life Insurance Company v. Commissioner*, 853 F.2d 1435, 1438 (7th Cir.1988), *vacated on other grounds*, 492 U.S. 902, 109 S.Ct. 3208, 106 L.Ed.2d 559 (1989). *See also Rexnord, Inc. v. United States*, 940 F.2d 1094, 1096 (7th Cir.1991).

■ The Internal Revenue Code, 26 U.S.C. § 4975(a), imposes a five-percent excise tax upon any "disqualified person who participates in [a] prohibited transaction" with certain pension plans. Prohibited transactions include "any direct or indirect transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan...." 26 U.S.C. § 4975(c)(1)(D). Section 4975 was added to the Internal Revenue Code by ERISA. ERISA "is a comprehensive remedial scheme designed to protect the pensions and benefits of employees...." *Wood v. Commissioner*, 955 F.2d 908, 910 (4th Cir. 1992) (quoting H.R.Rep. No. 533, 93d Cong., 1st Sess. 910 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4647–4648), *cert. granted*, —— U.S. ——, 112 S.Ct. 2937, 119 L.Ed.2d 562 (1992)). The prohibited transactions section is intended to prevent people with a close relationship to a plan (disqualified persons) from using the relationship to the detriment of plan beneficiaries. *Id.* Because § 4975 is part of a remedial scheme, we do not construe its provisions narrowly. *See id.* at 914 (citing *Leigh v. Engle*, 727 F.2d 113, 126 (7th Cir.1984)). *Wood* relies on the "direct or indirect" language of § 4975(c) to bolster its rejection of narrow constructions of § 4975.

In this appeal, O'Malley challenges only the tax court's finding that he "participated in" the prohibited transaction—the Fund's payment of his personal, criminal defense expenses. He concedes that he is a disqualified person under § 4975, that the Pension Fund's payment of his legal fees is a prohibited transaction, that the Fund is a plan under that section, and that the exemptions of § 4975(d) do not apply.[1]

---

1. Because the parties agreed that exemptions outlined in 26 U.S.C. § 4975(d) do not apply in this case, *O'Malley v. Commissioner*, 96 T.C. 644, 649–50 (1991), O'Malley's convoluted arguments on pp. 31–33 of his brief about the "amount involved" in the prohibited transaction, and the reasonableness of his attorneys' fees, which

O'Malley's primary argument before this court seems to be that because he has not violated § 406 of ERISA, 29 U.S.C. § 1106, he is not subject to the excise tax imposed by § 4975(a). Section 406, ERISA's prohibited transaction section, provides:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan;

O'Malley contends that because the Secretary of Labor did not find he violated this section, he cannot be subject to § 4975. This argument is specious. As the tax court pointed out,

[t]he basis for liability of a disqualified person for the excise tax under section 4975(a) and (b), i.e., participation, is not the same as the basis for liability of a fiduciary under section 406(a). A fiduciary is liable under section 406(a), ERISA, if he or she knowingly caused the plan to engage in a transaction which is described in section 406(a)(1), ERISA. Liability under that section is predicated upon a fiduciary's act on behalf of the plan which causes the plan to enter into the transaction and not upon the fiduciary's participation in the transaction itself.... Under section 4975(a) and (b), a disqualified person is liable for the excise tax if ... she participates in the transaction. Participation in section 4975 occurs any time a disqualified person is involved in a transaction *other than* as fiduciary acting only as such.

*O'Malley*, 96 T.C. at 650–51. *See also Pearland Investment Company v. Commissioner*, 62 T.C.M. (CCH) 1221, 1224–25 (1991) (Section 406 of ERISA prohibits fiduciaries from causing plans to enter into "prohibited transactions.")

■ The tax court's construction of the two sections is correct. The Department of Labor investigated violations of Section 406, see Trial Transcript at 93–104 (Testimony of Bruce Rinaldi, Attorney, De-

partment of Labor), and found that the trustees who voted to pay O'Malley's criminal defense fees violated § 406. The Department settled the claim against the trustees. The Fund had insurance to cover any loss the Fund sustained as a result of a fiduciary's breach of duty. Because the voting trustees were found to have breached their duties under § 406 by voting to pay O'Malley's defense costs, the insurance coverage was triggered. Trial Transcript at 99–102 (Testimony of Rinaldi). All the trustees signed a policy release prepared by the insurance companies as a condition of the companies' reimbursement to the Fund of the misappropriated defense costs. O'Malley was not a "settling trustee" in the sense the term was used in the settlement agreement. In that agreement the term referred only to trustees who participated in the approval of his attorney fees. *Id.* at 110. Because O'Malley did not participate in the approval, he did not breach his fiduciary duty under § 406. *See Schulist v. Blue Cross of Iowa*, 553 F.Supp. 248, 254 (N.D.Ill.1982), *aff'd* 717 F.2d 1127 (7th Cir.1983) (explaining that § 406 is "inapposite" when fiduciary has not caused the Plan to engage in a prohibited transaction).

The insurance companies covered the loss caused by the breach of fiduciary duty by the six trustees who authorized the payment of O'Malley's fees. *Id.* at 113. Nevertheless, as the tax court explained, this does not mean O'Malley did not participate in the prohibited transaction, or that he is exempt from the § 4975 excise tax. This ruling is not inconsistent with the Department of Labor's finding that only the voting trustees violated § 406 of ERISA.

■ We return then, to the only question presented by the appeal. Did O'Malley's implied request for and receipt of a free defense constitute participation in the prohibited transaction? We believe it did. Certainly without O'Malley's meeting with Lehr to arrange for representation, and his continued acceptance of Hundley's services with knowledge that the Fund was picking

draw upon the exemptions to liability outlined in § 4975(d), are without merit.

up the tab, the transaction could never have occurred. There was at the very least an indirect use of the plan assets for the benefit of a disqualified person. § 4975(c)(1)(D). This is all that is required for the imposition of the tax. As the disqualified person who received the benefit, O'Malley is the proper person to pay the tax. Further, if disqualified persons, particularly trustees, could structure transactions whereby they receive a substantial benefit at the Fund's expense and escape liability simply by abstaining from the formal vote, the entire purpose of the section would be circumvented. (We can envision a "you-vote-for-mine-and-I'll-vote-for-yours" scenario.)

We believe this case represents a paradigmatic example of a person "with a close relationship to a plan ... using the relationship to the detriment of plan beneficiaries." *Wood*, 955 F.2d at 914. Here, O'Malley, with the knowledge and consent of his fellow trustees, tried to bribe a United States Senator to benefit the trucking industry. When things did not go as planned, O'Malley's associates on the board agreed to help him out by using plan funds to pay for premier legal talent. This arrangement could confer no possible advantage or value upon the beneficiaries of the plan. The questionable propriety of the arrangement should have been confirmed by the trust agreement's failure to provide for the reimbursement of criminal defense fees. The trustees cured this problem with a retroactive amendment.

On these facts, we conclude that O'Malley participated in the prohibited transaction and is subject to the excise tax imposed by § 4975(a). For the foregoing reasons, the decision of the tax court is

AFFIRMED.