T.C. Memo. 2000-106

UNITED STATES TAX COURT

THOMAS F. AND TOYIA A. NOONS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11163-98.                    Filed March 28, 2000.

<u>James A. Cerks</u>, for petitioners.

<u>Susan M. Pinner</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, <u>Judge</u>:  Respondent determined a $35,080 deficiency in petitioners' 1993 Federal income tax and a $2,490 addition to tax pursuant to section 6651(a)(1). The deficiency arises from respondent's reclassification of a $197,234 legal fee deduction petitioners claimed on Schedule C as a Schedule A deduction.  As a

consequence of this reclassification (1) the amount of the deduction was reduced because of the 2-percent floor on miscellaneous itemized deductions pursuant to section 67(a), and (2) petitioners became subject to the alternative minimum tax.

Petitioners filed their joint 1993 tax return late. They offered no evidence, and made no reference in their posttrial briefs, regarding their liability for the section 6651(a)(1) addition to tax for failure to timely file a return. Consequently, we deem petitioners to have conceded this matter, and therefore the only issue for decision is whether the $197,234 in legal fees is deductible as Schedule C business expenses or as Schedule A miscellaneous itemized deductions. Resolution of this issue turns upon whether the legal fees were incurred by Thomas F. Noons (petitioner) in connection with his trade or business, as petitioners maintain, or were incurred for the production of income, as respondent maintains.

All section references are to the Internal Revenue Code as in effect for the year in issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits submitted therewith are incorporated herein by this reference.

Petitioners resided in Houston, Texas, at the time they filed their petition. For the year at issue, they were husband and wife; they divorced in 1995.

Petitioner's Employment: 1983-88

Petitioner emigrated to the United States from Great Britain in 1983. Almost immediately he obtained employment with Mainland Savings Association (Mainland), a savings and loan association located in Houston, to computerize their commercial lending and service operations. Later, after demonstrating an ability to manage complex real estate investment transactions, he became head of Mainland's commercial lending branch, charged with overseeing a $1.5 billion commercial loan portfolio. Petitioner's employment with Mainland ended in early 1986 after Mainland was placed in receivership by the Federal Savings and Loan Insurance Corporation (FSLIC). Thereafter, he began to explore different business opportunities in which to invest. He attempted to establish a chain of Fuddrucker restaurants in the United Kingdom. He also attempted to develop a wildlife safari park in Jamaica. Neither venture materialized.

In May 1986, petitioner was approached by Eastdil Realty, Inc. (Eastdil), a real estate investment bank based in New York that specializes in managing large (typically over $400 million) real estate portfolios for major corporations and others, and was

offered employment to assist Eastdil in establishing a southwest office.

Petitioner was permitted to engage in real estate activities on his own behalf. Petitioner focused his efforts on acquiring and selling selected nonperforming secured promissory notes. In this respect, petitioner spent many hours perusing real estate offerings, obtaining lists of nonperforming assets, performing on-site inspections, interviewing the management of targeted properties, and doing financial projections.

Forum 303 Note and Its Acquisition

In early 1988, C. Marshall Rea (Mr. Rea), an attorney, and petitioner caused a corporation, known as AMI Resources, Inc. (AMI), to be formed under the laws of the State of Texas in order to purchase a note, dated December 1, 1982, executed by Forum 303, Ltd., in the original principal amount of $4 million (the Forum 303 note) that was held by FSLIC as receiver for Mainland. The Forum 303 note was secured by a deed of trust that constituted a second lien on a shopping center located at Forum Drive and Highway 303 in Dallas, Texas. Under the terms of the note, Forum 303, Ltd., was required to make monthly payments of $36,667, with a balloon payment of $3,878,597 due in January 1993.

Mr. Rea was the president and sole shareholder of AMI; petitioner was the secretary and a director of the company.

Petitioner's brother, Phillip Noons (P. Noons or his brother),

was employed by FSLIC as an asset manager. Through his brother, petitioner became aware of the existence of the Forum 303 note. On February 24, 1988, AMI submitted a bid of $690,000 for the Forum 303 note. On February 25, 1988, P. Noons prepared a memorandum to his superiors at FSLIC in which he determined the value of the Forum 303 note to be $683,356; consequently, he recommended that AMI's bid be accepted. P. Noons did not inform his supervisors that his brother (petitioner) would be involved in the purchase of the note. Nor did P. Noons indicate that he had overstated the amount of the first lien on the underlying shopping center. Accepting P. Noons' recommendation, FSLIC approved the sale of the Forum 303 note to AMI.

To finance the transaction, petitioner borrowed against his personal assets approximately $600,000 from National Westminister Bank in London, England. Petitioner deposited the proceeds of this loan into a trust account in St. Peter's Port, Guernsey (Unicorn Trust).[1]

Unicorn Trust lent AMI $690,000. As collateral for the loan, Mr. Rea pledged all of his stock in AMI to Unicorn Trust. The $690,000 was not directly transferred from Unicorn Trust to AMI. Rather, the $690,000 was first deposited in AMI's bank account

---

[1] Petitioner was both the grantor and a beneficiary of the Unicorn Trust. He intended to make the individual who had raised him and was his legal guardian one of the beneficiaries of the trust.

located in the Cayman Islands (AMI Offshore).  From AMI Offshore, the funds were transferred to AMI's bank account at Texas Commerce Bank in Houston (AMI Domestic).  AMI purchased the Forum 303 note using the funds deposited with AMI Domestic.

Subsequent Forum 303 Note Transactions

Forum 303, Ltd., began making monthly payments on its note to AMI beginning on March 28, 1988.  Monthly payments for May, June, and July totaling $105,101 were deposited into the AMI Domestic account.  Thereafter, the funds were routed through AMI Offshore to the Unicorn Trust account in Guernsey.  Although Forum 303, Ltd., continued to make monthly payments to AMI, no funds were transferred to the Unicorn Trust account after July 1988.

On November 9, 1988, Mr. Rea rescinded the Forum 303 note transaction and received $376,664 (the remaining unpaid amount on the note) from FSLIC.  (Apparently AMI had the right to rescind the transaction at any time.)  Mr. Rea did not inform petitioner that the transaction was being rescinded.  Instead of repaying Unicorn Trust, Mr. Rea kept the proceeds.

In 1992, petitioner, on behalf of Unicorn Trust, sued Mr. Rea for failing to repay the loan owed by AMI to Unicorn Trust.  In 1997, petitioner had the case dismissed without prejudice after deciding the debt was not collectible.  AMI never filed corporate tax returns reporting income from the Forum 303 note.

Petitioner's Indictment

Petitioner and his brother were indicted in 1989 in connection with the acquisition of the Forum 303 note. The indictment alleged, inter alia, that petitioner and his brother conspired to defraud FSLIC by causing it to sell the Forum 303 note to AMI at a price far below its actual net realizable value. On March 23, 1993, the indictment was dismissed for lack of sufficient evidence after the Government admitted that its key witness, who petitioner alleges was Mr. Rea, was untruthful. In defending himself from the indictment, petitioner paid $197,234 in legal fees. It is the classification of these fees that is the subject of the instant dispute.

Petitioner's Business Endeavors

a. Preaccident

In February 1988, petitioner began negotiations to buy a portfolio of commercial loans from Killeen Savings & Loan, a Cleveland, Texas, bank. The transaction was to be completed by July 1988.

In addition, in April 1998, petitioner and an associate agreed to make an offer to purchase a four-story house in London, England, intending to convert the property into apartments. On April 20, 1988, petitioner sent a letter of intent to the property owner enumerating the terms upon which he would purchase the property.

One of the terms was petitioner's inspection of the property before closing.

### b. Traffic Accident

On June 16, 1988, petitioner was struck by a truck and severely injured. He sustained face, neck, back, and leg injuries. As a result of his injuries, he was classified as disabled by the Social Security Administration. Between 1988 and 1993, petitioner underwent 15 operations and months of physical rehabilitation; he was unable to work on a consistent basis. Petitioner required additional operations in 1995 and 1996 to alleviate back pain sustained as a result of the accident.

Because of petitioner's accident, he was unable to complete the purchase of either the commercial loan portfolio from Killeen Savings & Loan or the property in London.

### c. Postaccident

In 1995, petitioner formed a limited liability company (LLC), called Flagship Home Builders (Flagship), in which he was a 50-percent limited partner. Flagship was in the business of constructing custom homes. Petitioner did not purchase or sell promissory notes with respect to any of Flagship's business transactions.

In 1997, petitioner formed Heights Venture (Heights), an LLC, in which he was a 1-percent general partner and an 80-percent limited partner. Heights was in the business of purchasing,

managing, and renovating apartment complexes. After Heights acquired an apartment complex and assumed the mortgage thereon, petitioner bought the underlying mortgage note from the holder with the intent of selling it at a premium. Since Heights' inception, petitioner has purchased seven discounted promissory notes; at the time of trial, he had not resold any of them.

Also in 1997, petitioner formed Museum Place (Museum), an LLC in which he was a 1-percent general partner and a 40-percent limited partner.[2] Museum is in the business of purchasing and renovating apartment properties. Petitioner did not purchase or sell promissory notes with respect to any of Museum's business transactions.

Petitioners' 1993 Federal Income Tax Return

Petitioners filed their 1993 Federal income tax return on April 17, 1995. On their return, petitioners deducted as a Schedule C business expense legal fees totaling $197,234.

Notice of Deficiency

In the notice of deficiency, respondent determined that petitioners' legal fees were not deductible as a Schedule C business expense but rather were allowable as a Schedule A miscellaneous itemized deduction. As a consequence of this recharacterization (1) the amount of the deduction was decreased

---

[2] Petitioner owns 35 percent of Museum directly and 5 percent indirectly through petitioner's control of British American Properties of Houston, Ltd.

because of the section 67 floor on miscellaneous itemized deductions, and (2) petitioners became subject to the alternative minimum tax under section 55.

Because of petitioners' failure to timely file their 1993 Federal income tax return, respondent determined that an addition to tax pursuant to section 6651(a)(1) should be imposed.

OPINION

The issue to be resolved is whether legal fees petitioner incurred in 1993 in defending himself from criminal charges are deductible as a Schedule C business expense or as a Schedule A miscellaneous itemized deduction. If the fees are deductible as a Schedule C business expense, then the $197,234 would be deductible in full and petitioners would not be subject to the alternative minimum tax. If the fees are deductible as a Schedule A expense, then the deduction would be subject to the floor limitation placed on miscellaneous itemized deductions pursuant to section 67(a) and petitioners would be subject to the alternative minimum tax.

Section 162(a) allows a deduction for all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". In order to be deductible on Schedule C, an expense must be directly connected with, or proximately result from, a trade or business of the taxpayer. See Kornhauser v. United States, 276 U.S. 145, 153 (1928); O'Malley v. Commissioner, 91 T.C. 352, 361 (1988), affd. 972 F.2d 150 (7th Cir.

1992); <u>Peters, Gamm, West & Vincent, Inc. v. Commissioner</u>, T.C. Memo. 1996-186.

Section 212 allows an individual to deduct all ordinary and necessary expenses paid or incurred in (1) producing income, (2) managing, conserving, or maintaining property held for the production of income, or (3) determining, collecting, or refunding a tax.

Litigation expenses may be deductible under either section 162 or section 212. See <u>Guill v. Commissioner</u>, 112 T.C. 325, 328-329 (1999); <u>Davis v. Commissioner</u>, T.C. Memo. 1999-250; <u>Peters, Gamm, West & Vincent, Inc. v. Commissioner</u>, <u>supra</u>. Section 162(a) governs the deductibility of litigation costs as a Schedule C business expense, while section 212 governs the deductibility of litigation costs as a Schedule A miscellaneous itemized deduction, when the costs are incurred as a nonbusiness profit-seeking expense. See <u>Guill v. Commissioner</u>, <u>supra</u> at 328. Sections 162(a) and 212 are considered in pari materia, except that section 162(a) requires a trade or business, whereas section 212 requires the pursuit of investing or profit making that lacks the regularity and continuity of a business. See <u>United States v. Gilmore</u>, 372 U.S. 39, 44-45 (1963); <u>Guill v. Commissioner</u>, <u>supra</u> at 328. Thus, in order for petitioner's legal expenses to be deductible as a Schedule C business expense, petitioners must demonstrate that in

1993, petitioner was regularly and continuously engaged in a trade or business involving the sale of promissory notes.

Petitioners maintain that (1) during 1993 petitioner was engaged in the trade or business of acquiring and selling underperforming promissory notes, and (2) the legal fees incurred were proximately related to petitioner's trade or business activities. Respondent does not challenge petitioners' contention that the legal fees were related to the acquisition of the Forum 303 note. Rather, respondent disagrees with the assertion that petitioner was engaged in the trade or business of acquiring promissory notes. In this regard, respondent alternatively contends: (1) Petitioner's acquisition of the Forum 303 note was an isolated investment transaction that does not rise to the level of a trade or business; or (2) petitioner was acting within the scope of his employment with AMI when he pursued the acquisition of the Forum 303 note. Under either position, respondent posits petitioners' legal fees would not be deductible under section 162(a). For the reasons that follow, we agree with respondent that petitioner's legal fees are not Schedule C business deductions.

In our opinion, petitioner was not in the trade or business of acquiring and selling real estate promissory notes. He did not regularly or continuously enter into the purchase and sale of these types of promissory notes. Although we are mindful that on several occasions between 1986 and 1988 petitioner attempted to acquire

promissory notes, only once did he negotiate the purchase of an instrument on his own behalf. Moreover, as a consequence of his accident, petitioner conducted few, if any, real estate transactions between 1988 and 1995.

To be deductible as a Schedule C business expense, legal costs must arise from, or be proximately related to, a business activity of the taxpayer. Petitioner and his brother were indicted on account of events related to the acquisition of the Forum 303 note. AMI (not petitioner) acquired the Forum 303 note. Although petitioner obtained the financing for the acquisition, the purchase agreement for the Forum 303 note explicitly states the purchaser of the note to be "AMI Resources, Inc." Moreover, title in the note passed from FSLIC to AMI. As a result of the transaction, AMI was entitled to all distributions made on the note and apparently had the ability to rescind the transaction at any time; accordingly, AMI, rather than petitioner, retained the incidents of ownership from the acquisition of the Forum 303 note. On the basis of the record before us, we conclude that the Forum 303 note was purchased and owned by AMI and is proximately related to its (not petitioner's) trade or business.

To conclude, we sustain respondent's determination that the legal fees are deductible as a Schedule A miscellaneous itemized deduction and as such generate the alternative minimum tax and are

subject to the 2-percent floor on miscellaneous itemized deductions.

In reaching our conclusion herein, we have considered all arguments presented and, to the extent not discussed above, find them to be irrelevant or without merit.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.