T.C. Memo. 2000-362

UNITED STATES TAX COURT

ERIC TEST AND ODELIA BRAUN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4907-99.               Filed November 27, 2000.

<u>Karen L. Hawkins</u>, for petitioners.

<u>G. Michelle Ferreira</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>: Respondent determined a $24,647 deficiency in
petitioners' 1994 Federal income tax and a $4,929 accuracy-
related penalty pursuant to section 6662(a).[1]  The issues for our
consideration are:  (1) Whether legal fees incurred by

---

[1] Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the year in issue, and
all Rule references are to the Tax Court Rules of Practice and
Procedure.

petitioners are deductible as Schedule C business expenses or as Schedule A miscellaneous itemized deductions, and (2) whether petitioners are liable for the accuracy-related penalty under section 6662(a).

## FINDINGS OF FACT[2]

Petitioners resided in Redwood City, California, at the time they filed their petition. Petitioners filed a joint Federal income tax return for the 1994 tax year.

Odelia Braun (petitioner) is a medical doctor, who in 1985 was hired as an Associate Physician Diplomate and Assistant Clinical Professor of Medicine at the University of California, San Francisco (UCSF). When petitioner began working at UCSF, she was responsible for patient care in the emergency room and for training residents and medical students. Petitioner acquired an interest in the aspect of emergency medicine that was provided before the patient arrived at the hospital; i.e., the care that was rendered by paramedics and firefighters.

From 1985 through 1987, petitioner undertook a study of cardiac arrest emergency response systems in San Francisco, California, and around the United States. Petitioner, with the assistance of paramedics and firefighters, collected medical data on all patients who suffered cardiac arrest in San Francisco and

---

[2] The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

learned that only 4 percent survived. Petitioner traveled around the country and visited other emergency medical services (EMS) to determine whether improvements in the San Francisco EMS systems could be made. After undertaking these studies, petitioner put together a proposal for the City of San Francisco to revamp the EMS system. One specific part of the proposal focused on the need to get defibrillators to the people suffering from cardiac arrest sooner, for example by putting defibrillators on firetrucks.

After petitioner's plan was approved by the board of supervisors, the department of public health, and the San Francisco Fire Department, petitioner approached her supervisors at UCSF. The university created the Center for Prehospital Research and Training (CPRT) as a structure for petitioner to work in and continue her research. In 1987, petitioner became the director of CPRT. CPRT taught emergency preparedness and cardiac pulmonary resuscitation (CPR) to the public and studied prehospital cardiac arrest treatment. Petitioner's main role as director of CPRT centered on research.

During her years as director of CPRT, petitioner successfully wrote research grant proposals and contract proposals for training firefighters in medical procedures, training emergency medical technicians and paramedics for ambulances, training school teachers in CPR, training school

children in emergency recognition and response, and for training the general public in CPR. By 1993, petitioner had received local, statewide, and national acclaim and letters of support for her efforts to improve public awareness of the need to learn and perform CPR at the earliest possible indication of a heart attack. Prominent members of the medical and political communities supported her efforts to expand her public sector training concepts.

Petitioner's Business Venture--Save-a-Life Systems

As petitioner was implementing emergency medical response training programs within public entities, she formulated the idea that private sector emergency response systems were needed to coordinate with the public systems in order to insure that cardiac emergencies which occurred in private facilities received the proper recognition and the proper medical response until the public emergency response system arrived on the scene. As a result, petitioner decided that there was a need to teach people in public and private facilities how to recognize an emergency in progress, where to find emergency equipment placed within the building, how to place a call to the public emergency response system using "911", and how to administer CPR and/or use a defibrillator until the arrival of the public emergency response team.

In an effort to prove that expansion of the emergency medical response training into the private sector was worthwhile, petitioner worked with the San Francisco Giants organization to create the first prototype for a private facility emergency response system. The ushers at Candlestick Park were trained to recognize emergencies and to communicate the occurrence of an emergency to the paramedics and emergency response teams located throughout the stadium. Automatic defibrillators were also placed in the stadium for use by the trained staff during cardiac emergencies. Petitioner's work with the San Francisco Giants' emergency response program was done in her individual, private capacity and not as the director of CPRT.

In May 1992, petitioner collaborated with others in preparing a business plan for a private company called "WorkSafe America Corp." The business plan expanded on petitioner's concept to bring EMS systems into the private sector by encouraging private industry to purchase defibrillation equipment and place it in strategic locations where statistics showed the public was more apt to need and benefit from access to such equipment. The strategy was to create a consortium of vendors (of defibrillators), large employers, and an implementation/training team headed by petitioner which would place equipment and trained personnel in locations where heart

seizures were most likely to occur--in private work and recreational facilities.

In June 1992, petitioner met with Attorney Lawrence Eisenberg for advice regarding how to set up a business. They discussed the steps needed to introduce petitioner's WorkSafe America Corp. concepts of providing emergency medical care training and defibrillator training to the private sector. The name to be utilized for petitioner's concept was revised when petitioner applied to the Department of Corporations in California and learned that the name WorkSafe America Corp. was already being used by another organization. The new name selected by petitioner was "Save-a-Life Systems" (SLS), but the concepts and goals for petitioner's private business did not change.

In November 1993, a new business plan for SLS was developed and petitioner met with different defibrillation companies. Negotiations went the farthest with Physio-Control, a defibrillator manufacturer located in Redmond, Washington. During the first quarter of 1994, petitioner, Mitchell Rappaport, and Doron Braun traveled to Washington to meet with Physio-Control and present their plan to the multiple areas within the organization. The purpose of the meeting was to share petitioner's concepts and seek a partnership with Physio-Control which would result in funding for SLS. The meeting with Physio-

control was very positive, and petitioner believed that Physio-Control was prepared to partner with SLS and provide funding for her private business venture.

## The State Audit of CPRT

In November 1993 the State of California Office of the State Auditor initiated an audit of UCSF which was directed at the department of medicine and included CPRT. The State audit was precipitated by allegations of noncompliance with university policy leveled against the department of medicine.

Harry Cordon, director of audit and management services at UCSF, was responsible for all interaction with the Office of State Auditor during its conduct of the audit. UCSF was concerned about certain procedures being employed during the State audit and retained Coopers & Lybrand to perform a shadow audit. During both the State audit and the Coopers & Lybrand audit, petitioner made herself available and expended a great deal of time and effort providing information requested by the auditors. At no time during the audits did Harry Cordon believe petitioner's position at UCSF was in jeopardy or that she should be concerned about her employment with UCSF. In fact, petitioner received continued assurances during the audits that her position was secure with the CPRT, and in June 1994, USCF extended petitioner's contract as director of CPRT through June 1995. The State's audit report was made public in November 1994.

Between July and November 1994, the San Francisco Chronicle and the San Francisco Examiner newspapers published several articles referencing CPRT and the State audit. As a result of these articles, petitioner was concerned that adverse publicity would impact her ongoing efforts to obtain funding for SLS. In June 1994, petitioner consulted with two attorneys, Charlotte Fishman and Laura Stevens, because of concerns she had about leaks of information to the media regarding the State audit and the potential impact of adverse publicity to her professional reputation.

On June 30, 1994, petitioner retained the law firm of Rogers, Joseph, O'Donnell & Quinn (RJO&Q). Petitioner consulted with her lawyers at RJO&Q many times in 1994. On the advice and recommendation of RJO&Q, petitioner also retained the law firm of Topel & Goodman.

According to RJO&Q's billing reports, the following legal services were performed for petitioner during June, July, August, and September 1994: (1) Research, preparation, and drafting of documents for the criminal prosecution of petitioner and CPRT; (2) preparation of a lawsuit to prevent the release of the draft State audit report; (3) research, preparation, and meetings with respect to the State audit investigation of CPRT; (4) review of documents in petitioner's personnel file regarding sex discrimination; (5) research, preparation, meetings, and drafting

correspondence with respect to the Coopers & Lybrand audit of CPRT; (6) responding and communicating with the media; and (7) communication with petitioner's criminal defense attorney, William Goodman.  All of the billing statements sent to petitioner from RJO&Q for services performed in June, July, August, and September of 1994 were, according to their heading, regarding the "State audit of CPRT and Dr. Braun".

Between July and November 1994, petitioner and her lawyer consulted with a public relations firm regarding media response strategy and the preparation of press releases on behalf of petitioner.  As a result of the adverse publicity being printed in the San Francisco news media, petitioner put the incorporation and development of SLS on hold.  Around this time, Physio-Control also put its plans to fund SLS on hold.

Petitioners' Tax Return

Petitioners' 1994 Federal income tax return was prepared by Ronald Stern, a certified public accountant (C.P.A.).  Mr. Stern had prepared petitioners' income tax returns for 15 years. Before preparing petitioner's Schedule C for the 1994 tax year, Mr. Stern discussed with petitioner the purpose of the legal and professional services proposed to be deducted.

For the 1994 tax year, petitioners deducted $87,300 on Schedule C for legal and professional fees.  Respondent determined that petitioner's legal fees, in the amount of

$70,611, are deductible as a Schedule A miscellaneous itemized deduction as opposed to a Schedule C deduction.[3]  Respondent also determined that petitioner is entitled to an additional depreciation deduction on her Schedule C in the amount of $3,180.

OPINION

The issues for our consideration are:  (1) Whether legal fees in the substantiated amount of $64,412.36 and/or $6,198.64 of expenses in connection with SLS are deductible on petitioner's Schedule C as ordinary and necessary business expenses or whether they are deductible on petitioners' Schedule A as unreimbursed employee business expenses subject to the 2 percent of adjusted gross income floor and the alternative minimum tax, and (2) whether petitioners are liable for an accuracy-related penalty under section 6662(a).

Legal Expenses

Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  Ordinary and necessary legal expenses are generally deductible under section 162(a) when the matter giving rise to the expenses arises from, or is proximately

---

[3] While petitioners deducted $87,300 in legal and professional fees on Schedule C, Profit or Loss From Business, of their Form 1040, U.S. Individual Income Tax Return, in 1994, they have conceded that only $70,611 has been substantiated.  Of the $70,611 in substantiated expenses, $6,198.64 were expended by petitioner for services in connection with petitioner's Save-a-Live systems (SLS) business.

related to, a business activity.  See Kornhauser v. United States, 276 U.S. 145, 153 (1928).

In order to be deductible on Schedule C, an expense must be directly connected with, or proximately result from, a trade or business of the taxpayer.  See id.; O'Malley v. Commissioner, 91 T.C. 352, 361 (1988), affd. 972 F.2d 150 (7th Cir. 1992).  If a taxpayer's trade or business is that of being an employee, however, then the legal expenses will be treated as an itemized deduction, subject to the limitation of section 67.  See McKay v. Commissioner, 102 T.C. 465 (1994), revd. on other grounds 84 F.3d 433 (5th Cir. 1996); Alexander v. Commissioner, T.C. Memo. 1995-51.

The deductibility of legal fees depends on the origin and character of the claim for which the expenses were incurred and whether the claim bears a sufficient nexus to the taxpayer's business or income-producing activities.  See United States v. Gilmore, 372 U.S. 39 (1963).  The Supreme Court stated that "the origin and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer, is the controlling basic test".  Id. at 49.  Thus, in order for petitioner's legal fees to be deductible on her Schedule C, the origin of those legal services must have been rooted in SLS, her Schedule C business.

Petitioners maintain that the legal fees are correctly

claimed on Schedule C because the expenses are directly related to petitioner's professional reputation, and thus SLS. Respondent argues that the origin of petitioner's legal fees did not arise from her Schedule C trade or business, and that under United States v. Gilmore, supra, the consequences to petitioner's Schedule C business are irrelevant to the analysis.

Based upon the record, the origin of petitioner's legal fees stems from her status as an employee of UCSF, and not from her Schedule C trade or business. The event that prompted petitioner to hire attorneys in 1994 was the State audit of CPRT and the impending release of the audit report. While the record is replete with testimony from petitioner regarding the reasons she retained legal counsel, it is also replete with evidence that the event that prompted the legal services was the State audit. The billing detail from petitioner's attorneys indicates that the majority of their services concerned the impending release of the State's audit report and centered around the State audit of CPRT. The billing detail further indicates that the legal services performed were directly related to her employment with UCSF as director of CPRT. Indeed, the entire record indicates that petitioner hired attorneys in response to the State audit of CPRT.

We do not question whether petitioner was engaged in a Schedule C trade or business. Nor do we doubt that petitioner

was indeed concerned that the State audit and consequences flowing from the audit could negatively affect her professional reputation and therefore her Schedule C business.  However, we are bound by the rule established by United States v. Gilmore, supra, to look to the origin of the underlying claim and not the consequences.  Petitioner's motives for hiring attorneys and exploring her legal options simply are not relevant.  The origin of the claim herein was not in the trade or business of SLS but rather in petitioner's activities as an employee of UCSF.  The event that caused her to hire attorneys, the State audit of CPRT, was directly related to her employment as director of CPRT.  The legal expenses were incurred in response to an event that was not part of SLS' business, but, rather, was part of petitioner's employment.  Thus, the fact that the legal services may have resulted in damage control necessary to fend off disparaging publicity and salvage petitioner's Schedule C business relationships is irrelevant because the State audit, which had nothing to do with SLS, was the precipitating event.

Petitioners contend that the legal fees were not incurred in connection with any litigation, but instead they were incurred to seek advice and counsel.  Thus, they argue, it is appropriate to examine the nature of the taxpayer's concerns and the reason the advice is sought.  Petitioners cite Ahadpour v. Commissioner, T.C. Memo. 2000-68, for the proposition that costs associated

with legal advice obtained while trying to protect one's business reputation are deductible. Petitioners' reliance on <u>Ahadpour</u>, however, is inapposite because in that case we (1) did not consider whether the taxpayer was protecting his professional reputation, (2) concluded that the taxpayer was not entitled to a deduction for legal fees, and (3) did not suggest that a separate test for determining deductibility applies when dealing with fees for legal advice as opposed to fees for litigation. Indeed, in <u>Ahadpour v. Commissioner</u>, <u>supra</u>, we utilized the "origin of claim" test set forth in <u>United States v. Gilmore</u>, <u>supra</u>.

Accordingly, we find that the claim or event that prompted petitioner to incur legal fees did not arise in connection with petitioner's Schedule C trade or business, and therefore we sustain respondent's determination that the legal fees in the amount of $64,412.36 are deductible as unreimbursed employee business expenses on Schedule A.

With respect to the $6,198.64 expended by petitioner for services in connection with petitioner's SLS business, petitioners are entitled to claim that amount as a business expense on the Schedule C for the 1994 taxable year. Accordingly, to that extent, petitioners have shown respondent's determination to be in error.

Accuracy-Related Penalty

Respondent determined that petitioners underpaid a portion of their income tax because of negligence. Section 6662(a) imposes a penalty in an amount equal to 20 percent of the portion of the underpayment attributable to negligence or disregard of rules or regulations.

Negligence is defined as any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and the term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c). The accuracy-related penalty will apply unless petitioners demonstrate that there was reasonable cause for the underpayment and that they acted in good faith with respect to the underpayment. See sec. 6664(c)(1).

Taxpayers can avoid liability for the accuracy-related penalty if they engage a competent professional to prepare their returns, and they reasonably rely on the advice of that professional. See Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011, 1017 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Taxpayers must show that they provided all relevant information to the professional. See Pessin v. Commissioner, 59 T.C. 473, 489 (1972).

Applying these principles to the instant case, we conclude that petitioners have sustained their burden of establishing that reasonable cause and good faith existed for deducting legal fees

on petitioner's Schedule C.  Petitioner testified credibly at trial that she engaged the professional services of Ronald Stern, a C.P.A., to prepare petitioners' income tax return for 1994. Mr. Stern had prepared petitioners' income tax returns for the past 15 years.  According to petitioner, Mr. Stern questioned her about the legal and professional fees because he wanted to understand what services the attorneys were performing. Accordingly, petitioner provided him with information regarding those expenses.

The characterization of legal fees in this case as either a Schedule A or a Schedule C deduction involves analyzing and applying a set of facts to a technical area of the law.  Thus, in the context of determining the correct deduction for legal expenses that touch both upon a taxpayer's employment and trade or business, it is reasonable for a taxpayer to consult and rely on a C.P.A.  Here, petitioners were clearly relying on Mr. Stern to determine the proper characterization and deduction of the legal fees.  Based on the record we find that petitioners have proved that their actions with respect to characterizing the legal fees as Schedule C deductions were reasonable and are not subject to the section 6662(a) accuracy-related penalty.

Respondent also contends the fact that petitioners claimed deductions in excess of what they actually substantiated warrants the imposition of the accuracy-related penalty.  Petitioners were

able to substantiate only a portion of the deductions that they claimed on Schedule C.  Petitioners did not provide any explanation as to why they were unable to substantiate all of the legal fees that they claimed as deductions.  Thus, with respect to the substantiation item, we find that petitioners have failed to show that their actions were reasonable and not made with intentional disregard of rules or regulations.  Under these circumstances, we hold that petitioners are liable for the accuracy-related penalty under section 6662(a) on the portion of any underpayment attributable to the deduction of legal fees that were not substantiated.

We have considered all other arguments of the parties, and to the extent not addressed herein we find them to be either moot, meritless, or irrelevant.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155.</u>